553 So.2d 494 (1989)
Larry DENLEY and Mary M. Denley
v.
PEOPLES BANK OF INDIANOLA.
No. 58430.
Supreme Court of Mississippi.
May 3, 1989.
Rehearing Denied December 6, 1989.
Kenneth K. Crites, S. Allan Alexander, Patterson, Tollison & Alexander, Oxford, for appellants.
E. Stephen Williams, Young, Scanlon & Sessums, Jackson, for appellee.
Charles F. Johnson, III, Edward A. Wilmesherr, E. Marcus Wiggs, III, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for amicus curiae.
Before ROY NOBLE LEE, PRATHER and BLASS, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Larry Denley and wife, Mary, instituted suit against Peoples Bank of Indianola (Bank) in the Circuit Court of Tunica County, which suit was transferred to the Circuit Court of Sunflower County. They charge that the Bank's method of computing interest on a home loan which they paid ahead of schedule was usurious when satisfied, and they sought the penalties provided by the usury law. The lower court granted summary judgment in favor of the Bank, and the Denleys have appealed here, assigning two (2) errors committed by the lower court.

Facts
The facts of this case are undisputed. On July 16, 1984, Mary and Larry Denley (the Denleys) borrowed $14,007.50 from the Peoples Bank of Indianola (the Bank). The promissory note, secured by a deed of trust on residential real estate, provided for a precomputed finance charge of $9,796.22 (at an annual percentage rate of 16%) and the Denleys signed the precomputed note for $23,803.72 ($14,007.50 plus $9,796.22). The note provided that the Denleys were to pay $230.00 per month for 59 months and a final balloon payment of $10,233.72. The note provided in part:
I may prepay this note in whole or in part at any time. However, any partial prepayment will not reduce or excuse any subsequently scheduled payments until this note is paid in full. If and when prepaid in full, or upon maturity by acceleration, the finance charge will be recalculated using the rule of 78's to determine exact amount then due.
Approximately 16 months after obtaining the loan, when the Denleys had made 14 payments of $230.00 each, they sought to pay off the entire indebtedness. The Bank computed the amount of the payoff balance to be $15,302.53 and the Denleys paid that amount. Having made 14 monthly installment *495 payments of $230.00 each, the Denleys had paid a total in monthly installments of $3,220.00. That amount added to the payoff balance of $15,302.53 meant that the Denleys in the 16th month of the loan had paid $18,504.13 plus two late charges totalling $18.40, or a total sum of $18,522.53. The Denleys were shocked to learn that during the second year of the loan, after having paid $3,220.00, they owed a payoff balance of an amount greater than originally had been received from the Bank. The Bank computed the payoff by recalculating the finance charge on the note, using the rule of 78's as provided in the promissory note. All parties agreed that use of the rule of 78's in this case results in the lender's retaining more of the finance charge than the lender would be entitled to retain if the finance charge were computed by the actuarial method.[1]

Law

I.

THE LOWER COURT ERRED IN RULING THAT MCA § 75-17-1(12) (SUPP. 1985) [RECODIFIED AS MCA § 75-17-31 (1987)] DID NOT PROHIBIT THE BANK FROM CHARGING A FINANCE RATE WHICH EXCEEDED 4% FOR THE PREPAYMENT OF A RESIDENTIAL HOME LOAN IN THE SECOND YEAR.

II.

THE LOWER COURT ERRED IN FAILING TO RULE THAT MCA § 75-17-1(4) (SUPP. 1987) MANDATES THAT INTEREST BE COMPUTED BY THE ACTUARIAL METHOD AND PROHIBITS THE CALCULATION OF INTEREST RATES BY THE RULE OF 78's FOR THE PURPOSE OF INTEREST REBATES TO HOME LOAN BORROWERS.
The two assigned errors present the single issue of whether or not the Bank is statutorily prohibited from computing a rebate of finance charges on a precomputed loan by the method of 78's, if the resulting yield to the Bank on prepayment is greater than that specified in Mississippi Code Annotated § 75-17-1(4) (Supp. 1987) or exceeds the penalty allowed by § 75-17-1(12) (Supp. 1985). The Denleys contend that when they paid off their promissory note in sixteen (16) months after having made fourteen (14) payments, they should have been subject to a finance charge (interest) only for the time that they had use of the money. The rate on their note was precomputed to give the Bank a yield of sixteen percent (16%). It was agreed that the Bank could legally have contracted for an 18.43% rate at the time the note was signed.
*496 When the Bank was asked by the Denleys to compute a payoff amount, the Bank, in accordance with the terms of the note, computed by use of the rule of 78's a payoff balance of $15,302.53, which the Denleys paid. This payoff balance, when added to the $3,220.00 already paid in monthly installments, brought the Denleys' total payment to $18,504.13 (exclusive of late charges).
The Denleys calculate the yield to the Bank on the transaction to be 23.86% of the amount borrowed. They acknowledge they owe interest for the period of time during which they had use of the money and calculate that the Bank's actual earned interest for that period was $2,934.96, and that the Bank was prohibited by § 75-17-1(4) from collecting an amount in excess of $2,934.96 in finance charges. They acknowledge that, had the Bank so contracted, it could have collected an additional prepayment penalty, but that the amount which the Bank received in excess of actuarily-computed earned interest, even if considered a prepayment penalty, is also excessive, since it exceeds 4% of the unpaid principal balance as stated in MCA § 75-17-1(12) (Supp. 1985).
The Bank contends that nothing in the statutes provides that the actuarial method is to be used upon voluntary prepayment of the credit obligation.
Pertinent parts of the interest statutes which relate to and control the question follow:
(1) The legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum through June 30, 1986, and six percent (6%) per annum thereafter, calculated according to the actuarial method, but contracts may be made, in writing, for payment of a finance charge as otherwise provided by this section or as otherwise authorized by law.
* * * * * *
(4) Notwithstanding the foregoing and any other provision of law to the contrary, through June 30, 1986, any borrower or debtor may contract for and agree to pay a finance charge which will result in a yield not to exceed the greater of ten percent (10%) per annum or five percent (5%) above the index of market yield of the Monthly Twenty-Year Constant Maturity Index of Long-Term United States Government Bond Yields, as compiled by the United States Treasury Department, each calculated according to the actuarial method, on any loan, mortgage, or advance which is secured by a lien on residential real property or by a lien on stock in a residential cooperative housing corporation where the loan, mortgage or advance is used to finance the acquisition of such stock. The term "residential real property" as used in this subsection, means real estate upon which there is located or to be located a structure or structures designed in whole or in part for residential use, or which comprises or includes one or more apartments, condominium units or other dwelling units.
MCA § 75-17-1(1) and (4). (Emphasis added)
The Bank contends that the method provided by the Rule of 78's in computing interest is not prohibited by the statute and relies upon § 75-17-11, following:
When any particular rate of interest per annum is specified in any contract or evidence of indebtedness, it shall not be construed as any increase of said rate merely that the interest at the specified rate per annum is stipulated to be paid quarterly, or semi-annually, or at any other period less than a year, nor shall the fact that the principal and interest is paid at a date earlier than that stipulated in the contract or evidence of indebtedness be taken as any increase of the rate percentum although paid for the whole period stipulated; provided, however, that the provisions hereof shall not apply where such contract or evidence of indebtedness is renewed or extended in any manner within the period stipulated and a rate of interest is contracted for, collected or received as compensation or consideration, or as a result thereof, directly *497 or indirectly, for the remaining portion of the period stipulated.
MCA § 75-17-11 (1972).
The Bank cites Hood v. First National Bank in Meridian, 208 Miss. 658, 45 So.2d 251 (1950), as authority for its position. Hood is distinguished in that the note which was paid early had a maturity date "plainly and definitely fixed at ninety days after the date of the note." This Court emphasized the fact that the note in question did not permit payment "on or before ninety days after date," and said that a "creditor is not obliged to receive repayment of a debt or interest thereon before maturity." 45 So.2d at 253, citing Beck v. Tucker, 147 Miss. 401, 409, 113 So. 209, 210 (1927). See also Kornegay v. Georgia State Building & Loan Ass'n, 91 Miss. 551, 44 So. 783 (1907).
In Benoit v. United Companies Mortgage of Mississippi, Inc., 504 So.2d 196, 198 (Miss. 1987), this Court declined to decide "what is and what is not a prepayment penalty." We note that the Court there was applying a statutory section of the Small Loan Regulatory Law, which expressly authorizes the use of the rule of 78's. MCA § 75-67-127(1)(c) (Supp. 1985). Not so here.
We are of the opinion that § 75-17-1(4) is controlling in this case. Concisely, this section provides, in part:
any borrower or debtor may contract for and agree to pay a finance charge which will result in a yield not to exceed [specified percentages] each calculated according to the actuarial method, on any loan, mortgage or advance which is secured by a lien on residential real property... .
The terms "yield" and "calculated according to the actuarial method" are plain and unambiguous. At the beginning of this transaction, the bank precomputed the "finance charge" of $9,796.22 over the life of the loan. The contractual rate of "yield" to the bank was 16%, even though the permissible legal yield at the time was 18.43% per annum. The loan on its face was legal. A note which includes precomputed finance charges presupposes the note will be paid off according to its terms, i.e., it will run to maturity and legally yield the prospectively calculated amount to the bank. We conclude that "yield" simply means what the bank earns on a transaction, and that, if there is any alteration in the payment schedule, the "yield" must be recomputed at the time the indebtedness is discharged for it is only at the time of discharge (payment) that the actual "yield" can be determined.
When the Denleys elected to prepay the note, the bank was required to recalculate the amount of interest which it had earned over the term during which the Denleys actually had use of the borrowed money in order to come within the statute, i.e., § 75-17-1(4), limiting the bank to a specified "yield ... calculated according to the actuarial method." It was incumbent upon the bank to recalculate the interest by the actuarial method and not by the Rule of 78's so as not to exceed the specified legal rate of "yield." In failing to use the actuarial method provided by statute, the Bank received a yield of 23.86% on the principal for the period of the loan. Therefore, the judgment of the lower court is reversed, judgment is rendered here for the Denleys, and the case is remanded to the Circuit Court of Sunflower County for further proceedings consistent with this opinion.
REVERSED, RENDERED AND REMANDED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.
ANDERSON, J., not participating.

ON PETITION FOR REHEARING
ROBERTSON, Justice, concurring in denial of Petition for Rehearing.

I.
Experience has long taught that the law of the state may no more repeal the "laws" of economics than King Canute was able in the year 1028 to hold back the tidal waters of Denmark and England. Price fixing tries to repeal the laws of economics. Usury *498 statutes are price ceiling if not price fixing statutes. Credit is a commodity not different from a television set or an automobile, and there is no greater reason why the state should place ceilings on the price vendors may charge for the one than for the others. Nothing I am about to say marks any retreat from my long held view that usury statutes (like other price fixing regulations) are bad public policy resting on false premises (from the economic to the ethical) which in the long run hurt more than help their intended beneficiaries, see Robertson, Myth and Reality in Consumer Credit Rate Regulation, 43 Miss.L.J. 429 (1972), nor that where a vacuum be found in the law we should legislate sensibly, see Galloway v. Travelers Insurance Co., 515 So.2d 678, 686-87 (Miss. 1987) (Robertson, J., concurring). I but recognize (what judicially I must) that the legislative enactment enjoys a supremacy we are not at liberty to ignore.
Mississippi once had a simple usury statute  a single maximum rate of interest no lender could exceed on pain of forfeiture. No doubt in (partial) recognition of the economic folly of such a law but always having in mind its (un)biblical heritage and political popularity, the legislature has now given us a complex usury statute. The lesson of this case is that, if anything is worse than a simple usury statute, it is a complex usury statute.
From a variety of quarters  from the Appellee, Peoples Bank of Indianola, and from Amici Curiae, the Mississippi Department of Banking and Consumer Finance, and from the Mississippi and the American Bankers Association, we have been importuned to revisit the substance of the opinion released on May 3, 1989. We are told the practical effect of our decision, when read with other law, is to produce incongruous and anomalous results. We are told our opinion calls into question long-standing custom and practice within the banking business of this state, a point I suspect exaggerated a bit. We are told our reading of that part of the usury statute at issue is contrary to the interpretation of the Mississippi Department of Banking and Consumer Finance.
The answer to all of these points is found in the principle of legislative supremacy. The well aged legislative language at issue today has enjoyed a life that simply will not admit the points so potently put against it. The opinion of the Court is legally correct, and I write separately only to address some of the matters noted by the Bank and its friends on rehearing.

II.
The Court's opinion in a footnote says "Knowledge of the formula of the Rule of 78's is not necessary to an understanding of this case." The note is apt. Still, Bank and Amici take us to the woodshed pretty good over it. I offer a Ned-and-the-first-primer example suggesting the possibility that we do understand the Rule of 78's.

JARGON
PRECOMPUTED FINANCE CHARGE  This is the figure representing the total amount of finance charge[1] which will accrue over the natural life of the loan (i.e., projected accrued finance charge to the date of maturity). Pursuant to federal "Truth in Lending" regulations, this figure is computed at the time the loan is made by multiplying the amount financed times the annual percentage rate (APR)[2] and is included in the figure representing the total indebtedness.
EXAMPLE: A $1,000.00 loan for one year at an annual percentage rate (APR) of 12% (compounded annually) will yield a precomputed finance charge of $120.00. The debtor has thus committed to pay a total of $1,120.00. If the loan is to be repaid in twelve installments, then the finance charge is spread equally across the repayment schedule, resulting in twelve equal *499 payments of $93.33. (The rounding error of 4¢ is picked up in the last payment.)
REBATE OF UNEARNED FINANCE CHARGE  This term comes into play if under the terms of the loan the debtor is permitted to prepay the outstanding balance at some date prior to the scheduled end of its natural life (i.e., prior to maturity). The lender treats the transaction as though the debtor has paid all of the precomputed finance charge and then the lender remits the unaccrued portion.
EXAMPLE: In the above example, the debtor proposes to pay off the entire loan immediately after the third payment. He has paid three installments equalling $279.99, leaving a balance of the committed $1,120.00 at $840.01. In this circumstance, if the contract permits prepayment with penalty, the lender is not going to require that the debtor pay all of the remaining principal and all of the precomputed finance charge. Rather, the lender will compute how much of this total remainder ($840.01) represents finance charge which has not yet accrued and reduce the payoff figure by that amount.
RULE OF 78's  This is a method of computing the above defined figure, the rebate of unearned finance charge. It is also known as the "sum of the year digits method". The "78's" part of its name is derived from this fact  if one adds together the numbers from 12 to 1 (12 + 11 + 10 etc.), 78 is the resulting sum. It spreads the finance charges across the life of a loan using a fraction where 78 is the denominator (the number on the bottom). 12/78ths of the total precomputed finance charge (15.4%) is allocated to the first month, 11/78ths (14.1%) is allocated for the next, etc., until the 12th and last month, where 1/78th (1.3%) of the total finance charge is allocated.[3]
EXAMPLE: In the continuing example, the $120.00 precomputed finance charge would be allocated across the twelve payments thus: $18.46, $16.92, $15.36, $13.80, $12.36, $10.68, $9.24, $7.68, $6.12, $4.56, $3.12, $1.60 (4 cent round error). With prepayment occurring after the third payment, as above, $50.64 (42.2% of the total finance charge) will have already "accrued" under the Rule of 78's, leaving a rebate in the amount of $69.36 ($120.00  $50.64).

THE RUB
As the example illustrates, the Rule of 78's skews the accrual of finance charges in such a way as to inflate the charge early in the life of the loan. If, in our example, the borrower chooses to prepay the loan after the first installment, he will have paid $18.46 in "interest" for the use of $1,000.00 for one month's time  1.846% of the principal balance. This computes to an annualized interest rate of 22.15% (1.846 x 12). This aberration (for lack of a better word) is the nut of the present appeal.

III.
Statutory interpretation is the alpha and omega of this case. Our search for meaning begins with the legislative language, and, while we are charged to consider sensitively matters such as local custom, justifiable reliance and practical economy, fidelity to law demands nothing less than that any interpretation of a legal text first and foremost fit that text rather than some other text we may wish had been enacted. We seek no historical fact. We do not inquire what the draftsmen meant. We ask what the statute means. It happens that much of the legislative language today at issue has had a long life. We have given that language a number of authoritative readings and today's reading must take account of these, as they in fact inform the statute's meaning. We seek the best and most coherent meaning that may be given this living statute today, given the *500 world around us.[4] We seek an interpretative expression which both fits and justifies the statute. If, in the end, custom, reliance, economy and even reason be flouted, the complaint must be addressed to other doors.
We begin with the text. Our general usury statute in relevant part reads:
[A]ny borrower or debtor may contract for and agree to pay a finance charge which will result in a yield not to exceed the greater of ten percent (10%) per annum or five percent (5%) per annum above (a federal government index), each calculated according to the actuarial method, on any loan, mortgage, or advance which is secured by a lien on residential real property ...
Miss. Code Ann. § 75-17-1(4) (Supp. 1984) (1984 Miss. Laws ch. 501 effective July 1, 1984) (emphasis added). The sanction is then stated in the disjunctive:
If a greater finance charge than that authorized by applicable law shall be stipulated for or received in any case, all interest and finance charges shall be forfeited, and may be recovered back, whether the contract be executed or executory.
Miss. Code Ann. § 75-17-25 (Supp. 1984) (emphasis added).
The Bank finds it odd that "the loan on its face was legal" but that we may hold nevertheless its yield usurious. The Bank seems to be saying that, once a loan is found facially lawful, any ex post analysis of yield is pretermitted. The problem with the point is the legislative enactment of the disjunctive "stipulated for or received." This language has been in our law for years and it has long been known that a credit may be rendered usurious either by the creditor's contracting (i.e., stipulating) for a usurious rate or actually receiving usurious interest.[5]See Jefferson Standard Life Insurance Co. v. Davis, 173 Miss. 854, 858-59, 163 So. 506, 507 (1935); Chandler v. Cooke, 163 Miss. 147, 162, 137 So. 496, 498 (1931); Crofton v. New South Building & Loan Association, 77 Miss. 166, 179-80, 26 So. 362, 363-64 (1899); see also Cappaert v. Bierman, 339 So.2d 1355, 1357-58 (Miss. 1976).
On this score, today's opinion cannot surprise those who follow the law in this area.
Bank and Amici seek comfort in Miss. Code Ann. § 75-17-25 (Supp. 1989). A careful reading renders no relief. The section provides:
Subject to the other provisions of this section ... the finance charge may be calculated on the assumption that the indebtedness will be discharged as it becomes *501 due, and prepayment penalties and statutory default charges shall not be included in the finance charge. Nothing in Section 75-17-1 ... shall limit or restrict the manner of contracting for such finance charge, whether by way of addon, discount or otherwise, so long as the annual percentage rate does not exceed that permitted by law.

Miss. Code Ann. § 75-17-25 (Supp. 1989) (emphasis added).
Bank and Amici ignore that portion of the statute placed in emphasis above. They would have the Court's examination of the Denleys' loan cease upon a finding that the stated APR is within the permissible limits, irrespective of the APR legally and mathematically generated by the finance charges in fact received by the lender. Acceptance of the Bank's argument would effectively gut the "stipulate for or receive" language of Section 75-17-1. This is beyond our authority.[6]
The contract APR affects the accrual of finance charges only indirectly when the Rule of 78's is used, the actual accrual rate varying over the course of the contract's performance. Within the context of the actual accrual rate, the stated APR is little more than an index used as a computational starting point. At its heart, the Court's opinion simply recognizes what is mathematically obvious: that the rates of accrual generated by the application of the Rule of 78's APR might independently result in a usurious yield upon an ex post examination. This result is wholly consistent with established law.

IV.
Both the Bank and its friends are puzzled by the Court's sub silentio rejection of their claim that Miss. Code Ann. § 75-17-11 (1972) sanctions the use of the Rule of 78's in the computation of the rebate of unearned finance charges upon prepayment. That section provides, in relevant part:
Nor shall the fact that the principal and interest is paid at a date earlier than that stipulated in the contract or evidence of indebtedness be taken as any increase of the rate per centum although paid for the whole period stipulated... .
Miss. Code Ann. § 75-17-11 (1972). This language became law over sixty years ago. Miss. Laws ch. 179 (1926). The background premise is that a debtor has no right of prepayment except as granted by contract. See, e.g., Hood v. First National Bank In Meridian, 208 Miss. 658, 665, 45 So.2d 251, 253 (1950); Beck v. Tucker, 147 Miss. 401, 409, 113 So. 209, 210 (1927); Kornegay v. Georgia State Building & Loan Ass'n, 91 Miss. 551, 556-57, 44 So. 783, 784 (1907). Debtors at their election may not deny a lender the profit for which the latter has contracted. Debtors nevertheless from time to time desire to prepay, and the common law has developed a rule that a lender's demand for that to which it was entitled by contract, i.e., interest computed for the entire period of the loan, would not upon prepayment render the credit usurious.
Section 75-17-11 merely codifies this common law rule and provides, absent a contractual right of prepayment, that a lender's demand for the interest computed "for the whole period stipulated" in the contract (i.e., to maturity) does not render the transaction usurious if the debtor chooses to prepay. This statute also pretermits problems which may arise from the common practice of prepaying interest "up front", in the form of loan fees, discount, points, service and origination charges, and the like, all identified as finance charges by statute. Miss. Code Ann. § 75-17-25 (Supp. 1989).
The Bank and Amici struggle to find language in Section 75-17-11 that would trump Sections 75-17-1(4) and -25 and legalize the Rule of 78's even where the lender receives finance charges in fact usurious. They posit that the Bank could have *502 hypothetically demanded the entire precomputed finance charge pursuant to Section 75-17-11 without running afoul of the usury laws, and from that fallacious premise argue that, the fact that the Bank exacted less than the law allows should not work to its detriment. The fallacy in the premise is found in the Denleys' contractual right of prepayment without penalty. More fundamentally, the argument ignores the pivotal function of the ending date of the computational period and, more important, that the public law allows the parties the prerogative of fixing that date by private agreement.
The annual percentage rate Bank "received" of and from the Denleys is mathematically a function of the amount of the finance charge received and the beginning and ending dates. The dollar amount received is a matter of fact here undisputed. The beginning and ending dates are a function of contract, except to the extent proscribed by the positive law. The beginning date is the date of the extension of the credit, the date the loan documents were signed. The critical question becomes the date the law accepts as the ending date. That date turns on whether the Bank had legal authority to insist upon payment of finance charges for the whole period stipulated, notwithstanding the Denleys' desire in fact to pay their entire indebtedness prior to maturity. The math of the matter makes apparent that an earlier maturity yields a higher APR, an extended maturity a lower APR.
Bank and Amici rely heavily on Kornegay and Hood, but when sensitively read those cases are quite consistent with today's result.
In Kornegay, debtor obtained a loan and gave her note with interest at ten percent (10%) per annum, payable in monthly installments over an eight year period. Debtor by contract held a limited right of prepayment, viz. on the loan anniversary date, after giving ninety days advance notice of intent to prepay. Two years and a few months into the note's third year, debtor prepaid, including interest at ten percent for the entire third year. She then charged the lender with usury, arguing that the ending date for computing interest received was the date of prepayment, not the third anniversary date. The Court rejected her argument. The debtor by contract had no right of prepayment except on each loan anniversary date. The second having passed, the debtor had no right to compel lender's acceptance of prepayment until the third. In this state of the contract, the Court held the third anniversary date  and not the earlier date of prepayment  the terminal date for computing the rate of interest received. Hence, no usury.
The legislature thereafter enacted what is now Section 75-17-11.
In Hood, debtor executed a single payment note on May 1, 1946, due "ninety days after date," with interest at six percent (6%) per annum. The note was paid on May 31, fifty-nine days before maturity. The interest received by the bank would exceed the maximum allowed by law if the date of prepayment were the terminal date for interest computation purposes, but not so if the rate be computed over the full ninety day contract period. Hood holds the contract controls and that the ninetieth day after May 1 was the terminus, because the contract gave the debtor no right that creditor's interest entitlement cease upon prepayment. The Court emphasized "we are not dealing with a note which was due `on or before ninety days after date.'"[7]Hood, 208 Miss. at 665, 45 So.2d at 253. Significantly, Hood construes the predecessor of Section 75-17-11 in holding the transaction non-usurious. I read Hood as saying the opposite result would have obtained if the contract, expressly or implicitly, had empowered debtor to prepay and thereby stop creditor's entitlement to interest. In today's case the contract gives the Denleys precisely the right missing in Hood.
*503 Beck v. Tucker, 147 Miss. 401, 113 So. 209 (1927) in relevant part is to like effect. The Court held the payment of interest in advance did not render the transaction usurious
because it is clear that the creditor is not obliged to receive prepayment of a debt or interest thereon before maturity.
Beck, 147 Miss. at 409, 113 So. at 210. Conversely, had the note in Beck afforded debtor a right of prepayment, the date of payment would have been the terminal date for computing the rate of interest received.
The same rule appears in Oxford Finance Companies, Inc. v. Gray, 317 So.2d 910 (Miss. 1975). Debtors gave their note with interest at six percent per annum, payable in monthly installments, without right of prepayment. The note was secured by a mortgage on debtors' home, which was consumed by fire with thirty-nine installment payments yet to be made. Insurers paid the loss and in the subsequent litigation a usury question arose. The Court held the interest received non-usurious. In the absence of debtors' holding a right of prepayment, accelerated discharge of the note "would not have ... rendered [it] usurious even if the rate had exceeded eight percent." Gray, 317 So.2d at 912.
A simple point emerges from these cases. The ending date for computing the annual percentage rate is that fixed by contract. Where the contract affords debtor no right of prepayment, the ending date is the original maturity date of the loan. Section 75-17-11's phrase "for the whole period stipulated" acquires meaning. Where the contract affords debtor a right of prepayment having the effect of terminating debtor's obligation to pay interest, the date of prepayment becomes the terminal date, and Section 75-17-11 affords creditor no haven from a usury charge should the finance charge in fact received and the APR thus computed exceed that allowed by law. This is what Hood means when it rejects the usury charge because the Court was not dealing with a note which was due "on or before ninety days after date." Hood, 208 Miss. at 665, 45 So.2d at 253.
All of this may make little economic sense, but it makes perfectly good legal sense. Bank and Amici may find no salvation in Section 75-17-11.

V.
Bank and Amici argue that the most favored lender doctrine, see 12 U.S.C. § 85; C.F.R. § 7.7310(a), and the state parity statute, Miss. Code Ann. § 81-5-1(1) (Supp. 1989), will eviscerate this Court's decision with respect to covered institutions and place state banks at a competitive disadvantage with national banks. The argument is disingenuous on several points.
The most favored lender doctrine has its source in the National Bank Act of 1864 now codified in relevant part in 12 U.S.C. § 85. The act authorizes nationally chartered banks to charge the same rates of interest available to competing state banks. See Tiffany v. National Bank of Missouri, 85 U.S. (18 Wall.) 409, 412, 21 L.Ed. 862 (1873). The Comptroller of the Currency has provided the current expression of the rule
A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or Morris plan bank, without being so licensed.
12 C.F.R. § 7.7310(a). See also Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299, 313 n. 26, 99 S.Ct. 540, 548 n. 26, 58 L.Ed.2d 534, 545 (1978).
In the first place, the most favored lender status now extends to federally insured state banks. 12 U.S.C. § 1831d(a) (1982); Vanderweyst v. First State Bank of Benson, 425 N.W.2d 803, 805 (Minn. 1988).
*504 More important, nothing in the National Bank Act or the most favored lender doctrine has ever been construed to exempt national banks from state usury laws. More to the point, the doctrine will permit a national bank located in Mississippi to rebate unearned finance charges using the Rule of 78's because Miss. Code Ann. § 75-67-127(1)(c) and § 63-19-47 allow small loan companies and motor vehicle sales finance companies/retail sellers, respectively, to so rebate only to the extent that national banks engage in the small loan business or the motor vehicle sales finance business, or, in the words of the comptroller's regulation, only in the case of "such loans" where the national bank is engaged in head to head competition with a small loan company or a motor vehicle sales finance company. Bank and Amici misread the doctrine to provide that if any lender in the state may engage in a practice regarding interest rates or finance charges, a bank covered by the doctrine may seize upon the state authority and employ it across the board even to credits in no way of the class covered by the state enactment and notwithstanding that any state chartered competitors are prohibited the rates. This is simply not the law.
If this weren't enough, the state parity statute is surely adequate unto the day. That statute reads:
(10) In addition to other powers, a state-chartered bank shall have and possess such of the rights, powers, privileges, immunities, duties and obligations of a national bank having its principal place of business in this state as may be prescribed by the State Board of Banking Review by general regulation under the circumstances and conditions set out therein. In the event of a conflict between the provisions of this subsection (10) and any other provision of Chapters 1, 3, 5, 7, 8 or 9 of this Title 81, the provisions of this subsection shall control.
Miss. Code Ann. § 81-5-1(10) (Supp. 1989). Enough said.

VI.
The Court's opinion in this case most assuredly does not constitute a resounding condemnation of contractual prepayment provisions containing references to the Rule of 78's. Contracts containing such provisions are not automatically subject to challenge as usurious. The opinion condemns use of the Rule upon prepayment only in that small number of cases where there is a contractual right of prepayment without penalty and where prepayment is sufficiently early in the life of the credit that the operation of the Rule in fact results in the collection of a usurious yield. In those few cases, the bank may avoid the present grief by computing the rebate of unearned finance charge by the actuarial method.
I regard the portrait painted by Bank and Amici  that all Mississippi banks will have to re-structure thousands of loan agreements because of the inclusion of a prepayment provision referencing the Rule of 78's  as so much rhetoric.
I concur in denial of rehearing.
HAWKINS, P.J., concurs in this opinion.
BLASS, J., concurs in part only.
ANDERSON, J., not participating.
BLASS, Justice, concurring in part with opinion of ROBERTSON, Justice, concurring in denial of Petition for Rehearing.
I concur in part with Justice Robertson's Concurring Opinion, and agree that the Petition for Rehearing should be denied. I agree with that part of his opinion which deals with the facts of the case, the effect of the Court's opinion, the operation of the Rule of 78ths, and the plainly and clearly correct interpretation of the statutes, and in their application to the contract involved. I was surprised, and initially distressed that the Court should be so vigorously, rudely, condescendingly and mistakenly attacked by its "Amici". Had they not been *505 "friends of the Court", the language could well have been thought to be offensive.
NOTES
[1] Knowledge of the formula of the Rule of 78's is not necessary to an understanding of this case. It is sufficient to know that the Rule of 78's contains within it a systematic bias in favor of the lender if the loan is prepaid in the early years. A full description of the method is contained in an article by Hunt, The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transaction, 55 B.U.L.Rev. 331 (1975). This article also compares the Rule of 78's with the actuarial method.

A brief description of the rule is contained in the affidavit of Bank's expert Baughn as follows:
The rule is also referred to as the "sum of the digits" method and is based on the premise that the amount of finance charge rebated upon prepayment should reflect the fact that the consumer has use of a larger portion of the principal during the early part of the loan. Under the rule, each month of the loan's term is assigned a digit, with the first month's digit equalling the total number of months in the agreed period of the loan. The second month is then assigned a digit one less than that of the first, and so on, until the digit assigned to the last month equals 1. For a twelve (12) month loan, the sum of the digits is seventy-eight (78). The sum of the digits serves as the denominator in a fractional equation and the numerator is the sum of the digits for those months which have expired at the time of the prepayment.
The sum of the digits in the Denleys' loan is 1,830. The Denleys prepaid the note in full after fourteen (14) monthly payments and after sixteen (16) months into the term of the loan, they were entitled to a rebate of 990/1830 or 54.098% of the finance charge. Since the total finance charge was $9,796.22, the rebate to the Denleys was $5,299.59. Since the bank's earning and the consumer's rebate are complementary, Peoples Bank was entitled to charge $4,496.63 ($9,796.22 - $5,299.59 = $4,496.63) as the earned finance charge through the date of prepayment.
See also Note, Acceleration and Prepayment Disclosures under Truth in Lending: Nemesis of the Rule of 78's, 1978 Wash.U.L.Q. 141, 149 (1978).
[1] The term "finance charge" is legally defined in 15 U.S.C. § 1605; 12 C.F.R. § 226.4; and Miss. Code Ann. § 75-17-25 (Supp. 1989).
[2] The term "annual percentage rate" (APR) is legally defined in 15 U.S.C. § 1606; 12 C.F.R. § 226.14.
[3] The Rule of 78's is explained in Bone v. Hibernia Bank, 493 F.2d 135, 136-37 (9th Cir.1974); see also D. Thorndike, Thorndike Encyclopedia of Banking and Financial Tables 18-1 to 18-3 (1973); Hunt, The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transaction, 55 B.U.L.Rev. 331 (1975); Note, Acceleration and Prepayment Disclosures Under Truth in Lending: Nemesis of the Rule of 78's, 1978 Wash.U.L.Q. 141 (1978).
[4] See Mississippi Insurance Guaranty Assoc. v. Vaughn, 529 So.2d 540, 542 (Miss. 1988); Cuevas v. Royal d'Iberville Hotel, 498 So.2d 346, 359-60 (Miss. 1986) (Robertson, J., dissenting).
[5] Fatality does not attend all possible eventualities which may generate a usurious yield. Jackson Investment Co. v. Bates, 366 So.2d 225 (Miss. 1978), considered whether an event triggering a contractual provision causing an involuntary prepayment of a loan might create a usurious result subject to forfeiture of all interest. In Bates, the residential property securing the loan was destroyed, the resulting litigation a fight for the insurance proceeds. The lender laid claim to an amount equal to the outstanding principal and the precomputed finance charge  all interest, both accrued and that to accrue in the future to the date of maturity. That sum on that date would in fact yield usury. The Court, however, declined to hold the occurrence of a contingency producing a usurious yield would also compel a finding that the contractual indebtedness was usurious ab initio. That is, a finding of usury from the ex post perspective, when the loan is performed according to its terms, does not then dictate a conclusion that an ex ante analysis must yield a like finding.

It is true that logical argument can be made that in a loan in which the interest is discounted in advance the lender by requiring the borrower to procure insurance to retire the indebtedness if the security is destroyed, thereby contracts for a usurious rate of interest because the requirement acknowledges and demands prepayment before maturity. Nevertheless, we are of the opinion such requirement lacks contractual specificity to bring it within Section 75-17-1. The loan would not be usurious if the contingency for which the insurance was obtained did not occur, but if it did occur, it may or may not be usurious depending upon the time of the occurrence. The potential of violation of the statute through a contingency is not, in our opinion, a specific contract as contemplated by the statute.
Bates, 366 So.2d at 229 (emphasis added). See also Oxford Finance Co. v. Gray, 317 So.2d 910, 912 (Miss. 1975).
[6] By way of contrast, the Small Loan Regulatory Act expressly authorizes refunds computed by the "Rule of 78ths." Miss. Code Ann. § 75-67-127(1)(c) (Supp. 1989); see Benoit v. United Companies Mortgage of Mississippi, 504 So.2d 196, 197-98 (Miss. 1987). This legislative expression overrides the otherwise applicable APR limitation. See Miss. Code Ann. § 75-17-25 (Supp. 1989).
[7] The opinion of the Court makes cryptic note of the point made above but without elaboration.