797 So.2d 396 (2001)
ESTATE OF Edward Lee BAXTER, Deceased, Appellant
v.
SHAW ASSOCIATES, INC., Appellee.
Shaw Associates, Inc., Cross/Appellant
v.
Estate of Edward Lee Baxter, Deceased, Cross/Appellee.
No. 1999-CA-02126-COA.
Court of Appeals of Mississippi.
October 9, 2001.
*398 John M. Deakle, William R. Couch, Hattiesburg, for Appellant.
Lawrence Cary Gunn Jr., L. Clark Hicks Jr ., John Michael Herke, Hattiesburg, for Appellee.
Before SOUTHWICK, P.J., THOMAS, and IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Shaw Associates, Inc. was awarded $44,500 by a circuit court jury for a breach of a personal guarantee of unpaid royalties on a restaurant franchise that had been executed by Edward Lee Baxter. On appeal, Baxter's estate argues various reasons for the unenforceability of the guarantee. Error is also claimed when the trial court allowed expert testimony by an attorney and awarded prejudgment interest and attorneys fees. Shaw cross appeals, alleging error in the calculation of prejudgment interest and attorneys fees. We find no error and affirm in all respects.

FACTS
¶ 2. Shaw Associates, Inc. entered into an Area Development Agreement with Bonanza Restaurants in order to open several Bonanza restaurants in Florida and Alabama. As the area developer, Shaw could either open the restaurants himself or contract with others through a licensing agreement to open a Bonanza. In 1987, Jim Hogan gathered several other investors including Edward Lee Baxter to form Bay City Family Restaurants, Inc. Bay City entered into a Licensing Agreement with Shaw to open a Bonanza Restaurant in Mobile, Alabama.
¶ 3. Under this agreement, all investors were obligated to sign a personal guarantee covering all aspects of the licensing agreement. Only Hogan and Baxter signed the personal guarantee. From the testimony at trial it appears that several investors refused to sign the guarantee. However, no issue was made below regarding the effect of the failure of the others to execute personal guarantees. Baxter's guarantee was notarized on December 17, 1987, but the date of the instrument was left blank. No issue was made of the omission of a signature date.
*399 ¶ 4. After operating for less than a year, the restaurant failed. Several investors brought suit against Nick Shaw, the owner of Shaw Associates, under various theories in United States District Court. Mr. Shaw went into personal bankruptcy and a settlement was reached between the parties. A document entitled "Mutual Absolute Release" was executed. It released the area developer Shaw personally, and the investors, personally and through Bay City, from suit against the other. Shaw Associates, Inc. was also released from possible litigation and paid the $15,000 settlement on behalf of Mr. Shaw. However, the investors were not personally released by Shaw Associates. The absence of that last potential release is what made the present litigation possible.
¶ 5. Soon after the mutual release was executed, Shaw Associates filed this suit against Baxter. The claim rested on the personal guarantee that Baxter had signed and sought payment of royalties due from the Mobile restaurant to the area developer Shaw Associates under the licensing agreement. That last agreement required royalties to be paid amounting to 4.8% of the gross sales.
¶ 6. Baxter died in early 1998. A motion to substitute his estate as a party was filed in February 1999 and granted. Trial began August 30, 1999. The jury awarded $44,500 to Shaw Associates. After the verdict and initial judgment, the trial judge amended the judgment to allow attorneys fees of one-third the verdict. Also awarded was prejudgment interest from May 15, 1995, the date that the court found Baxter should have known that the Area Development Agreement was still in effect and that royalties were due under it. Baxter appeals and Shaw Associates cross appeals.

DISCUSSION
¶ 7. Baxter's appellate issues will be examined first, then those raised by Shaw by cross-appeal.

1. Deception or fraud.
¶ 8. Baxter argues that he was entitled to a directed verdict because the personal guarantee that is the source of potential liability for the royalties was obtained through deceit and fraud. A deposition had been taken from Baxter and it was read into the record at trial. He explained that at the time the guarantee was presented to him, he did not have his glasses. He asked Shaw over the telephone to explain the document. Baxter claims that Shaw told him it was a non-compete agreement and nothing was mentioned about a personal guarantee.
¶ 9. There was contrary evidence. Shaw testified that a non-compete agreement was discussed in the same conversation as the personal guarantee. Shaw explained to Baxter that the guarantee secured the performance of the licensing agreement. Part of that was a non-compete agreement, and also included payment of the disputed royalties, advertising fees and other obligations.
¶ 10. A written contract is to be upheld unless it is obtained through deceit or misrepresentation. Continental Jewelry Co. v. Joseph, 140 Miss. 582, 585, 105 So. 639, 639 (Miss.1925). Baxter relies on a precedent in which one party signed the principal agreement only after being assured that an addendum would remove a certain provision. Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc., 584 So.2d 1254, 1256 (Miss.1991). When suit was brought on the contract and no corrective addendum had ever been prepared, the court allowed proof of mutual mistake or honest misrepresentation. Id. at 1258. *400 Although a person is obligated to read before signing a contract, failure to read is excused when this failure is induced by misrepresentation: "Where one party's false representations induce another party to contract, negligence of the second party cannot be raised to bar relief to him." Id. at 1259.
¶ 11. Unlike in Godfrey, Baxter had the entire document in hand. Its title was "Personal Guarantee," and consisted of one page. Baxter testified that he was unable to read the agreement because of not having his glasses and relied on Shaw's description of its purpose. There was conflicting testimony as to what was actually discussed between Baxter and Shaw. Shaw either said that it was a non-compete agreement, which was true but not the whole truth, or instead, Shaw more elaborately explained that it was a guarantee of all the terms in the licensing agreement. Baxter wanted a directed verdict, but that should not be granted unless the evidence is such that a reasonable jury would be unable to find for the non-moving party. Tate v. Southern Jitney Jungle, 650 So.2d 1347, 1349-50 (Miss.1995). Baxter's failure to read the entire agreement that was in his possession, and the absence of undisputed proof that Shaw falsely represented its contents, means that this was an issue for the jury.

2. Mutual Release
¶ 12. Baxter argues that this suit was settled by the Mutual Release signed by the parties in a previous lawsuit. Though the release did not include Shaw Associates, Inc., which was the entity owed the royalties sought in the present suit, Baxter argues that he was misled by Shaw's attorney into omitting that party. Baxter's attorney in the previous suit, Gary Thrash, allegedly asked Shaw whether there was any contractual relationship between Shaw Associates, Inc. and the parties signing the release. A letter from Thrash was introduced in which he had asked for certain information to be included in a pre-trial order in the initial suit in federal court. In that letter he stated that Shaw Associates was a corporation and that it had no relationship to the plaintiffs in that suit, among whom were Baxter. The letter also said that Thrash might need to make further changes after seeing the next version of the order. Thrash was not called to testify in this litigation as to the issue.
¶ 13. The Mutual Release itself does not name Shaw Associates, the plaintiff in the present suit. Baxter makes no complaint here that the issue of misrepresentation was improperly presented at trial. Instead he argues that he was entitled to a directed verdict or judgment notwithstanding the verdict because of being misled in the earlier litigation about Shaw Associates. We find the matter more ambiguous. Weighing the evidence at the time of the motion in the light most favorable to the non-moving party Shaw, the trial court correctly denied Baxter's motion for a directed verdict.

3. Expert Testimony
¶ 14. Baxter argues that he was unfairly surprised by Shaw's calling attorney Larry Gunn as an expert witness. Shaw never specifically named Gunn as a witness, but it did name as possible witnesses anyone on Baxter's list of witnesses. Gunn was named on Baxter's list. Thus Gunn was no surprise. The real issue is whether Gunn was allowed to testify as an expert witness.
¶ 15. Under the discovery rules, a party must disclose the name and content of any expert witness that it may call to testify. M.R.C.P. 26(b). Shaw did not by indicating it might call some of Baxter's witnesses *401 thereby identify Gunn as an expert nor give a summary of his testimony. The Supreme Court has reversed a trial court's decision to allow testimony of an expert witness who was not identified during the discovery process or in supplemental responses. Robert v. Colson, 729 So.2d 1243, 1246 (Miss.1999).
¶ 16. The problem with Baxter's argument is that Gunn was not offered, was not qualified by the court, and was not allowed to testify as an expert. He only testified as to his personal knowledge of the events in question. Baxter's objections to much of his testimony were sustained. We find no violation of the discovery rules for this witness.

4. Evidence of Damages
¶ 17. Shaw testified with the aid of a document that he had with him on the witness stand as to the amount of royalties due. This was the only evidence of Shaw's damages. Baxter argues that the party seeking damages must prove those damages by offering the best evidence. Strickland v. Rossini, 589 So.2d 1268, 1274-75 (Miss.1991).
¶ 18. Shaw argues that as president of Shaw Associates, he had extensive personal knowledge of the gross sales and the amount of royalties due. He was unsure who had prepared the document that he was using, but he testified that he personally had compared it to company records and was satisfied that the information was correct.
¶ 19. Baxter argues that the underlying information supporting the summary on the document that Shaw was using had to be introduced or at least furnished to the other party. In fact, though, we find that the amount of the unpaid royalties had been admitted in Baxter's response to the motion for summary judgment. Shaw's attorney raised this concession during the argument over Shaw's testimony about damages. Baxter had in his response to Shaw's summary judgment motion agreed with Shaw's calculations that from the amount of gross sales at this restaurant, the royalties due would be $25,598.18. Baxter just denied that any of these royalties were owed to Shaw. At trial Baxter's attorney argued that the admission was implicitly qualified, namely, that only if gross sales were of the amount claimed by Shaw were the calculations of royalty correct. We find no error in the trial court's decision that the fair reading of the summary judgment response was an unqualified agreement to the amount of royalties that would be owed, if ever it were proven that royalties were owed. The court determined that it would be unfair to require Shaw at trial, when it had justifiably believed the matter of the amount of royalties was uncontested, to offer detailed proof of its calculation. The court gave Baxter an opportunity to present contrary evidence on the royalties. These twin rulings were an entirely equitable and proper means to resolve the question.
¶ 20. Therefore the testimony that is in dispute under this issue was on a matter not actually contested, namely, the gross sales at the restaurant. The remainder of the damages sought by Shaw arose from the obligation in the licensing agreement that if the restaurant was closed without 24 months' notice to Shaw and Bonanza, the operators of the restaurant would owe 24 months' royalties as calculated from the six month to one year period immediately preceding the closing of the restaurant. Using the same figures that resulted in the $25,598.18 amount for unpaid royalties, a 24 month amount was found to be $89,410. That calculation has not been separately challenged.
*402 ¶ 21. Shaw was only entitled to one half the $89,410 and the remainder was due to Bonanza itself. Since Bonanza was not a party to this suit, the jury's award of $44,500 was mathematically close.

5. Jury Instruction.
¶ 22. A jury instruction stated that a mistake about the language in an executed document must be proven by clear and convincing evidence. Baxter argues that the evidentiary standard in fact is only a preponderance of evidence. This instruction relates to a possible mistake in Baxter's signing of the personal guarantee, as he testified that he believed it was only a non-compete agreement.
¶ 23. In order to allow a reformation of a contract due to mutual mistake or due to unilateral mistake if induced by fraud, the facts supporting the claim must be proven by clear and convincing evidence. Derouen v. Murray, 604 So.2d 1086, 1090 (Miss.1992); Hartford Fire Insurance Company v. Associates Capital Corporation, 313 So.2d 404, 408 (Miss. 1975) (clear and convincing or the Court has "even said that the proof must establish mutual mistake beyond a reasonable doubt"). We find no authority to the contrary and hold that the instruction was correct.

6. Failure Properly to Substitute the Estate of Baxter
¶ 24. Baxter sought to dismiss the suit for Shaw's failure properly to substitute the estate after the death of Mr. Baxter. A procedural rule requires that an estate be served with notice of a party's desire to substitute it in a lawsuit. The suit should be dismissed without prejudice "if the motion for substitution is not made within ninety days after the death is suggested upon the record by service of a statement of the fact of the death...." M.R.C.P. 25(a).
¶ 25. Baxter's estate argues that Baxter's death was suggested upon the record through Shaw's Motion for a Continuance on July 21, 1998. That motion alerted the trial court that Baxter had died and asked for a continuance until the next term of court so that an estate could be opened. It was not until well more than 90 days from the motion, being February 22, 1999, that Shaw filed a motion to substitute the estate. This motion was not served as Rule 25 provides on the estate. Instead it was sent to the attorney who had been representing Baxter prior to his death.
¶ 26. What starts the ninety days period is not just any reference in the record to a party's death, but "a statement of the fact of the death" that is served on parties in the suit under Rule 5 and on non-parties under Rule 4. M.R.C.P. 25(a). A mere reference to death in the motion for continuance does not start the count of the ninety days required under Rule 25. Hurst v. Southwest Mississippi Legal Services Corp., 610 So.2d 374, 385-87 (Miss. 1992), overruled on other grounds, Rains v. Gardner, 731 So.2d 1192 (Miss.1999).
¶ 27. A motion for substitution of the estate was filed before any formal suggestion of death was filed. Therefore the ninety day calendar was never relevant.

7. Prejudgment interest. Cross-Appeal: Date to commence prejudgment interest
¶ 28. After the jury verdict, Shaw filed a motion to award prejudgment interest and attorneys fees. The judge awarded prejudgment interest from May 31, 1995, the date that the judge found that Baxter should have known about a settlement reached between Shaw and Bonanza. The actual breach could have been dated much earlier, as the royalty payments under the *403 licensing agreement were due weekly, one week after the period of sales to which they applied. The restaurant was only open from January until December 1988, and therefore all the royalty had already been due for over six years by May 1995. The relevance of the settlement is that until Shaw's problems with Bonanza and his possible removal as an area developer had been resolved, it was not clear that Baxter or others would owe Shaw anything.
¶ 29. Baxter argues that he had no knowledge that Shaw had retained his position as an area developer. However, notice of the settlement was given in an affidavit by Shaw that was filed as an exhibit to a brief in support of Shaw's motion for summary judgment. The affidavit was filed on May 30, 1995, indicating that Shaw's problems with Bonanza had been resolved at some unstated earlier date. The trial judge began the period for prejudgment interest on the next day, May 31.
¶ 30. Generally, if prejudgment interest is to be awarded, it dates from the breach of contract. Stockett v. Exxon Corporation, 312 So.2d 709, 712 (Miss.1975). Whether to award is within the discretion of the trial judge, but discretion can be exercised only if a request for the interest appears in the pleadings as it did here. Warwick v. Matheney, 603 So.2d 330, 342 (Miss.1992). The trial court exercised his discretion in an unusual manner. If the agreement between Shaw and Bonanza had been terminated, Shaw would have had no right to the royalty payments. The existence of a breach of contract was therefore much in question. The trial judge found that Shaw had not been terminated, though, but that until May 30, 1995 Baxter would not have been aware of that fact.
¶ 31. Prejudgment interest is allowed only when there has been a bad faith denial of a payment or when the amount due has been liquidated. Preferred Risk Mutual Ins. Co. v. Johnson, 730 So.2d 574, 577 (Miss.1998). Here, the amount of royalties due on the contract was calculable. The specific amount had been stated in the original 1994 complaint in this suit as about $87,000. The final computation of $89,400 was given in Shaw's motion for summary judgment filed on January 25, 1995. That sum was supported by an exhibit to the motion.
¶ 32. Shaw argues that prejudgment interest should date from the breach in 1988 and not from 1995. Prejudgment interest may be justified when damages are liquidated, even if they are disputed. Id.Nonetheless, whether to award prejudgment interest is discretionary with the trial court. Simpson v. State Farm Fire and Cas. Co., 564 So.2d 1374, 1380 (Miss.1990). Interest may be denied if "there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefor." Thompson Mach. Commerce Corp. v. Wallace, 687 So.2d 149, 152 (Miss.1997), quoting Simpson, 564 So.2d at 1380. We consider the nature of this breach, including that Baxter was only one of several investors, that the obligation was uncertain for years because of Shaw's questionable status as area developer, and that the sum owed was not readily calculable. We find that the trial judge did not abuse his discretion in stating both that the sum owed for breach of this contract was liquidated, but that May 31, 1995 was a proper date to begin assessing prejudgment interest.

Cross-Appeal: Method of computing interest
¶ 33. Shaw argues that the court erred in awarding prejudgment interest calculated *404 as simple instead of compound interest. He supports his argument by reference to a statute whose operative language has existed in its present form since 1974.
The legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum, calculated according to the actuarial method....
Miss.Code Ann. 75-17-1(1) (Rev. 2000). In 1974 the statutory interest rate was only 6%, but the inclusion of the phrase "calculated according to the actuarial method" dates from that year. 1974 Miss. Laws ch. 564, § 1. No opinion of the Mississippi Supreme Court that we have discovered has explained how prejudgment interest is to be calculated under the "actuarial method."
¶ 34. Preliminarily, we should assure ourselves that this statute is the correct one to review. It does not refer to prejudgment interest, but it has nonetheless been relied upon in several Supreme Court decisions. E.g., Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902, 921 (Miss.1998). That may be because a breach of a contract that causes easily calculable damages is treated as an obligation under the contract for which this interest rate applies. Another recent case referred to both Section 75-17-1(1) and Section 75-17-7. Sentinel Industrial Contracting Corp. v. Kimmins Industrial Service Corp., 743 So.2d 954, 971 (Miss. 1999). This latter statute permits interest on a judgment starting no earlier than the date of the complaint. Miss.Code Ann. § 75-17-7 (Rev. 2000). Therefore, both statutes have been found to address prejudgment interest, one for any interest before judgment going back to the date of the damages, the other for interest after the suit is filed.
¶ 35. In this suit, interest did not commence until 1995. That was after the suit was filed in 1994 but before judgment in 1999. For this prejudgment interest, either statute was applicable. The judge could have provided for eight per cent interest calculated according to the actuarial method under section 75-17-1(1), or for interest "at a per annum rate set by the judge" under section 75-17-7.
¶ 36. What each method requires needs to be understood. Calculating "simple interest" on a judgment takes the original sum owed$44,500and multiplies it by the annual percentage rate and also by the number of years that interest has been owed. To simplify because that is the best that the opinion writer can do, eight percent simple interest for the six years from May 31, 1995 until May 31, 2001 would be $44,500 × .08 × 6 = $21,360.00. Thus on May 31, 2001, $65,860 ($44,500 + $21,360) would have been due.
¶ 37. Shaw says that approach was replaced by amended section 75-17-1. We thus examine the statute. What words mean is the most basic question in statutory analysis. What "actuarial method" means when calculating interest on judgments is the question that needs an answer here. A general statute has codified what has long been the rule in statutory interpretation that "words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning; but technical words and phrases according to their technical meaning." Miss.Code Ann. § 1-3-65 (Rev. 1998); Allgood v. Bradford, 473 So.2d 402, 411 (Miss.1985). If a statute is not ambiguous, the court should apply the plain meaning of the statute. Mississippi Power Co. v. Jones, 369 So.2d 1381, 1388 (Miss. 1979). Whether this statute is "plain" depends on whether the technical phrase "actuarial method" has a technical meaning that is plain.
*405 ¶ 38. The statute does not itself contain a definition of "actuarial method." Whenever model language or even a model act is adopted by a legislative body, that may mean that the new statute concerns a technical subject for which the assistance of a model act is desirable. The original adoption and subsequent revisions to the Uniform Commercial Code are among the best examples of technical legislation that has been widely adopted. What has not been a question in statutory analysis is whether the legislative body fully understood what it was adopting, or if not, whether for some provisions a less technical meaning should apply.
¶ 39. The principal reason for this observation is that the 1974 changes to the Mississippi statutes followed closely on the heels of the Federal Consumer Credit Protection Act of 1968, the most well-known component of which was the Truth-in-Lending Act. 15 U.S.C.S. §§ 1601-1693 (Rev. 1993). The federal statute itself states that its purpose was to provide for a "meaningful disclosure of credit terms," which the United States Supreme Court stated was achieved by "requiring all creditors to disclose credit information in a uniform manner...." 15 U.S.C.S. § 1601(a) (Rev. 1993); Mourning v. Family Publications Service, Inc., 411 U.S. 356, 364, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), quoting H.R. Rep. No.1040, 90th Cong., 1st Sess., 13 (1967). This Act introduced the phrase "actuarial method." 15 U.S.C.S. § 1606(a)(1)(A) ("annual percentage rate... [is] calculated according to the actuarial method"). Mississippi responded to interest rate problems by adopting some reforms in 1972, but they were vetoed by Governor Bill Waller, Sr. James L. Robertson, Myth & Reality in Consumer Credit Rate Regulation, XLIII Miss. L.J. 429, 429-30 (1972). Governor Waller noted that Mississippi's current interest rate laws "are in a state of confusion" and needed a more comprehensive review in order to develop necessary revisions. Id. at 430. The veto ultimately was allowed to stand. Ladner v. Deposit Guar. Nat'l Bank, 290 So.2d 263, 268 (Miss.1973).
¶ 40. The next legislative session after Ladner resulted in introduction of the changes that are relevant in this suit. By the time of final passage, all the relevant subparts of Section 75-17-1 referred to specific rates of interest "calculated according to the actuarial method." 1974 Miss. Laws ch. 564. This included the change to Section 75-17-1(1), which has been applied to prejudgment interest for breach of contract when the contract does not contain an interest rate. E.g., McLaurin v. Old Southern Life Ins. Co., 334 So.2d 361, 362 (Miss.1976).
¶ 41. The caption to the legislation, which also assists in determining its meaning, stated that its purpose was "to simplify and modernize the laws governing the lending of money, usury, extending credit, and the making of credit sales...." 1974 Miss. Laws ch. 564, caption; Aikerson v. State, 274 So.2d 124, 128 (Miss.1973) (title of bill can be used to assist in determining meaning).
¶ 42. We find that the entire process was as the bill's caption statedto fit Mississippi within the modernized view of consistency in the loaning of money, including in the calculation of interest. Therefore, regardless of whether the legislature fully appreciated all the ramifications of the new terminology, any more than a judge might, the technical meaning was adopted. The Supreme Court stated that "calculated according to the actuarial method" was "unambiguous." Denley v. Peoples Bank of Indianola, 553 So.2d 494, 497 (Miss. 1989).
¶ 43. Looking for the technical definition as understood in 1974, we find an *406 answer in an article cited in Denley. This article is what made the actuarial method "unambiguous" to the Supreme Court. James H. Hunt, The Rule of 78's: Hidden Penalty for Prepayment in Consumer Credit Transaction, 55 BOSTON U.L. REV. 331 (1975). "Actuarial method" was "a new name given to the traditional method of determining interest on an indebtedness." Id. at 336. The phrase was adopted by Congress for the Truth in Lending Act and became part of standard credit nomenclature. 15 U.S.C. § 1606. When the Mississippi legislature used this relatively new phrase in 1974, it was conforming the State's computation of interest to the means recognized in the new federal statutes. The Truth-in-Lending Act, then, is where we find the proper technical meaning. Even if legislators themselves never sought out the definition, the passage of a statute containing this technical term results in the adoption of its technical definition. Miss.Code Ann. § 1-3-65 (Rev. 1998).
¶ 44. The most familiar part of the Truth-in-Lending method is that any payment that is made on a debt is first applied to the interest that is then due, with the remainder to the outstanding principal. Hunt, Rule of 78's, 55 BOSTON U.L. REV. 336. A less familiar feature is that when a loan is not being paid on the installment basis or installments are delinquent, the actuarial method requires that unpaid interest be compounded, i.e., added to principal. These details are found in the regulations adopted to implement the Truth-in-Lending Act.
The annual percentage rate shall be determined in accordance with either the actuarial method or the United States Rule method. Explanations, equations and instructions for determining the annual percentage rate in accordance with the actuarial method are set forth in Appendix J to this regulation.
12 C.F.R. § 226.22(a)(1). The referenced Appendix J now states these rules:
(2) Under the actuarial method, at the end of each unit-period (or fractional unit-period) the unpaid balance of the amount financed is increased by the finance charge earned during that period and is decreased by the total payment (if any) made at the end of that period. The determination of unit-periods and fractional unit-periods shall be consistent with the definitions and rules in paragraphs (b)(3), (4) and (5) of this section and the general equation in paragraph (b)(8) of this section.
12 C.F.R. § 226, App. J(A)(2). For a "single advance, single payment transaction, the unit-period shall be the term of the transaction, but shall not exceed 1 year." 12 CFR § 226, App. J(B)(4)(ii). We find that this is a such a transaction for the following reasons. The obligation to pay $44,5000 that commenced on May 31, 1995, would be the equivalent of a "single advance." There is only to be a "single payment" to be made ultimately on the judgment. Thus the "unit-period" is a year even though the "term of the transaction" has proved to be much longer. For such single advance, single payment debts, "the unpaid balance [$44,500] of the amount financed is increased by the finance charge earned" during the unit-period, i.e., the year. That means the unpaid interest is added to the unpaid principal at the end of each year from the date of the debt, which is May 31, 1995. Even if the explanation was not written in precisely these terms in 1974 when Mississippi's statute was passed, we assume subject to correction that the key point of annual compounding was required.
¶ 45. If prejudgment interest is to be calculated here under that method, it would be as follows:

*407
1995-1996 $44,500 × .08 = $3560
1996-1997 ($44,500 + $3,560 = $48,060) × .08 = $3,844.80
1997-1998 ($48,060 + $ 3,844.80 = $51,904.80) × .08 = $4,152.38
1998-1999 ($51,904.80 + $4,152.38 = $56,057.18) × .08 = $4,484.57
1999-2000 ($56,057.18 + $4,484.57 = $60,541.75) × .08 = $4,843.34
2000-2001 ($60,541.75 + $4,843.34 = $65,385.09) × .08 = $5,230.81

¶ 46. The total due on May 31, 2001, would be $65,385.09 + $5,230.81 = $70,615.90.
¶ 47. The United States Court of Appeals for the Fifth Circuit made a guess as to the state courts' interpretation of the "actuarial method" language in section 75-17-1 by finding that this statute requires that interest be compounded annually. Stovall v. Illinois Central Gulf Railroad Co., 722 F.2d 190, 192 (5th Cir.1984). The court's authority for that definition was only that it was supported by the "uncontradicted evidence in the record" of the trial. Id.
¶ 48. We agree that prejudgment interest could have been calculated in the manner just described. However, the trial court refused to award interest that was compounded annually. Since this prejudgment interest was only for the period post-suit, section 75-17-1(1) and its requirement of the actuarial method was not the only usable authority. Section 75-17-7, which allows the trial court to set the rate and in effect the method of its calculation, could also be utilized. Though which statute was being used was not noted by the court, his refusal to apply section 75-17-1 was not beyond his authority or otherwise erroneous. We therefore affirm the award of interest.

Cross-Appeal: Attorneys fees.
¶ 49. Attorneys fees in the amount of one-third of the principal amount of the judgment were awarded by the trial judge. This amounted to $14,833 based on a $44,500 judgment.
¶ 50. Baxter argues that the jury was the proper decision-maker on fees and since Shaw failed to put on any proof as to the fees incurred, none should be awarded. However, in some kinds of litigation in which fees are permitted, there is in essence a presumption about the means to calculate attorneys fees. Whether this is such a case is among the issues to decide.
¶ 51. According to the license agreement between Shaw and Bay City, Shaw was entitled to reasonable attorneys fees if suit for a breach under the agreement was required. Attorneys fees are recoverable if allowed in a contract. Jackson County School Board v. Osborn, 605 So.2d 731, 735 (Miss.1992). Therefore fees in some amount may be awarded here.
¶ 52. As to the amount, there is a presumption in a collection suit in favor of awarding fees in the amount of one third of the indebtedness. DynaSteel Corporation v. Aztec Industries, Inc., 611 So.2d 977, 987 (Miss.1992). Shaw argues that the entire judgment of $44,500 and the prejudgment interest should have been the amount from which the one-third was taken. We find no controlling precedent on the point. The amount of attorneys fees is a matter for the discretion of the trial judge. Young v. Huron Smith Oil Co., 564 So.2d 36, 40 (Miss.1990). Thus, a judge's failure to follow a precise formula for calculation is not per se error.
¶ 53. There was no abuse in awarding this amount of attorneys fees.
¶ 54. THE JUDGMENT OF THE CIRCUIT COURT OF LAMAR COUNTY IS AFFIRMED ON DIRECT AND *408 CROSS APPEALS. APPELLANT IS ASSESSED WITH ALL COSTS OF THIS APPEAL.
McMILLIN, C.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER and BRANTLEY, JJ., concur.
KING, P.J., concurs in result only.