889 F.2d 612
 CYCLES, LTD., et al., Plaintiffs-Appellees,
v.
W.J. DIGBY, INC., et al., Defendants-Appellants.
CYCLES, LIMITED, Dale Yeager, Vida Donez Yeager, Dale
Yeager, Jr. and Sheila Yeager Hendrix, Plaintiffs-Appellees,
v.
W.J. DIGBY, INC., 1776 Corporation, James F. Digby, Donald
Digby and George Snyder, Defendants-Appellants.
 Nos. 88-4726, 89-4227.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 6, 1989.
Rehearing Denied Jan. 4, 1990.
 
 Barry H. Powell, Charles R. Davis, Jackson, Miss., Thomas, Price, Alston, Jones & Davis, for Donald Digby.
 Robert S. Murphree, Jackson, Miss., Charles J. Kimball, Denver, Colo., for W.J. & James Digby & George Snyder.
 David A. Barfield, Michael S. Allred, Satterfield & Allred, Jackson, Miss., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before CLARK, Chief Judge, GEE and SMITH, Circuit Judges.
 CLARK, Chief Judge:
 
 
 1
 Defendants W.J. Digby, Inc., 1776 Corporation, Jim Digby, Donald Digby and George Snyder in this consolidated appeal challenge the judgment of the district court awarding damages (No. 88-4726) and a postjudgment order awarding attorney fees (No. 89-4227) to plaintiffs Cycles, Ltd., Dale Yeager, Sr., Dale Yeager, Jr., Vida Donez Yeager and Shiela Yeager Hendrix. Because the defendants were not lawfully amenable to process under Mississippi's long-arm statute, we vacate both the judgment awarding damages and the order awarding attorney fees and remand the cause to the district court with directions to dismiss for want of jurisdiction.
 
 
 2
 * A. The Parties
 
 
 3
 This dispute arises from a sale-of-business transaction gone awry between seller Cycles, Limited (Cycles) and buyer W.J. Digby, Inc. (WJD). Plaintiff Cycles, a trucking firm engaged in interstate hauling, was a Mississippi corporation with its principal place of business from 1974 to mid-1979 in West Memphis, Arkansas. From mid-1979 onward the principal place of business was Rankin County, Mississippi. The Yeagers and Hendrix (collectively "Yeagers"), owners of all the Cycles stock, were Arkansas residents before 1979. They moved their residence to Mississippi in mid-1979, a year after the two sale agreements, described below, were executed.
 
 
 4
 In September 1978, after the execution of the sale agreements and before their termination in April 1980, involuntary bankruptcy proceedings were brought against Cycles and the individual plaintiffs in the Eastern District of Arkansas. Cycles was eventually adjudicated a bankrupt by that court, and an Arkansas trustee now represents its interests.
 
 
 5
 Defendant WJD, also in interstate trucking, is a Nevada corporation with its principal place of business in Denver, Colorado. The Digbys owned all of WJD's stock. WJD is not, nor has it ever been, qualified to do business in Mississippi. It has no employees or assets there. It has, however, received a Mississippi Public Service Commission permit to haul goods in interstate commerce through the state. Except for the authorized routes listed in the ICC operating authorities WJD was to purchase from Cycles as part of the sale agreements, the record contains no evidence of the frequency with which WJD hauled goods through Mississippi.
 
 
 6
 Defendant Donald Digby is a vice president of WJD and a Colorado resident; Jim Digby, president of WJD, is a Colorado resident. Defendant Snyder is a Colorado resident and employee of WJD. Defendant 1776 Corporation (1776), is a Nevada corporation with its principal place of business in Denver, Colorado. 1776's stock is also owned in large part by the Digbys.
 
 B. The Negotiations and Agreements
 
 7
 The Yeagers in 1978 sought to sell Cycles. Donald Digby heard of their desire and approached the Yeagers on behalf of WJD. Digby conducted negotiations with the Yeagers by mail and by telephone calls passing between Colorado and West Memphis, Arkansas. Donald and Jim Digby then conducted in-person negotiations with the Yeagers in West Memphis and Memphis, Tennessee in June 1978. At the conclusion of these negotiations, the parties executed two related sale agreements. The two corporations, Cycles and WJD, signed an ICC operating authorities and equipment lease-purchase agreement (lease-purchase agreement). A noncompetition and consultation agreement was entered into between WJD and the Yeagers (noncompetition agreement).
 
 
 8
 The lease-purchase agreement provided, subject to ICC approval, that WJD would buy the ICC authorities for $50,000, payable in ten annual installments of $5,000. Until approval was obtained, the authorities were to be leased for $1 per month. Two of the authorities allow the holder to haul specified goods from specified cities to "points in the United States (except Alaska and Hawaii)." The remaining authorities, while not prohibiting travel through Mississippi, do not authorize shipment of goods to points in the state.
 
 
 9
 In addition to purchasing the operating authorities, WJD was to buy all of Cycles equipment, 98 tractors and trailers, for $200,000 above the amount Cycles owed to equipment lessors and lienors. Pending ICC action, WJD agreed to rent the equipment for an amount equal to the monthly payments Cycles owed on each piece of equipment. Also during the interim, WJD was to use and maintain Cycles' equipment and return it if the ICC denied approval or granted it with conditions unacceptable to WJD. The agreement additionally provided that WJD would use best efforts to obtain a $200,000 loan for Cycles; WJD itself later made the loan. WJD also agreed to lease Cycles' West Memphis warehouse facility, the term to begin upon WJD's taking possession of Cycles' equipment. Finally, WJD could terminate both agreements in the event the ICC denied approval or unacceptably conditioned it.
 
 
 10
 The noncompetition agreement provided that WJD would pay the Yeagers $600,000 in fees over 10 years in exchange for their promises not to compete with WJD and to provide consultation services as needed. WJD planned to claim the fees were for consultation services, rather than a capital expenditure.
 
 
 11
 The parties also agreed that the contracts were to be construed under Colorado law and that all parties consented to Colorado jurisdiction.
 
 
 12
 After turning over Cycles' equipment and West Memphis facility to WJD, the Yeagers ceased operations in West Memphis, Arkansas and moved to Rankin County, Mississippi in mid-1979.
 
 
 13
 In April 1980 the ICC upheld an administrative law judge's decision granting approval to the transaction on condition that WJD capitalize, rather than expense as salary, the fees to be paid to the Yeagers pursuant to the noncompetition agreement. WJD found this condition to be unacceptable and thereafter terminated the agreements.
 
 C. Dispute and Litigation
 
 14
 Between June 1978 and April 1980 WJD possessed or controlled Cycles' equipment. During this time WJD allowed leases to terminate and equipment to be repossessed by Cycles' lessors and lienors. When WJD notified Cycles that it had elected to terminate the agreement, it informed Cycles that it would return none of the equipment. Several tractors and trailers had been returned to lessors with whom Cycles had ongoing lease contracts. Others were repossessed by lienholders and then repurchased by WJD or 1776. WJD made only two payments on the noncompetition agreement.
 
 
 15
 Cycles brought this action against WJD in August 1980, requesting return of the equipment, damages and an accounting. Proceedings were stayed pending the outcome of the Arkansas bankruptcy proceedings against Cycles. The stay was lifted in 1984, whereupon Cycles filed an amended complaint alleging breach of contract and conversion of the equipment. Defendants filed repeated motions to dismiss for lack of personal jurisdiction. The district court denied relief on all these motions without opinion, hearing or findings. After a bench trial, the court rendered judgment for Cycles and against all of the defendants, jointly and severally, in the amount of $3,777,642.58 in compensatory damages and $100,000 in punitive damages. The court later awarded plaintiffs $170,781.36 in attorney fees.
 
 II
 
 16
 All defendants assert on appeal that the district court lacked personal jurisdiction to adjudicate the suit. They claim that both Mississippi's long-arm statute, Miss.Code Ann. Sec. 13-3-57, and the due process clause of the fourteenth amendment to the federal Constitution prohibit the court from exercising jurisdiction.
 
 
 17
 The defendants also assert that the district court: (1) misconstrued Colorado and Mississippi law in finding there was a conversion; (2) erred in its calculation of damages; (3) erred by awarding punitive damages; (4) erred in finding the individual defendants liable; and (5) erred by awarding attorney fees.
 
 III
 
 18
 A defendant is amenable to personal jurisdiction in a diversity case to the extent permitted in a state court in the state in which the federal court sits. DeMelo v. Toche Marine, Inc., 711 F.2d 1260, 1264 (5th Cir.1983). The state court or federal court sitting in diversity may assert jurisdiction if: (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the fourteenth amendment to the United States Constitution. Id. at 1265. We consider first the reach in this case of Mississippi's long-arm statute because "the constitutional issue should not be considered if service was defective under the Mississippi statute." Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1167 (5th Cir.1985).
 
 
 19
 Mississippi's long-arm statute states in relevant part:
 
 
 20
 Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi. Such act or acts shall be deemed equivalent to the appointment by such nonresident of the secretary of state of the State of Mississippi, or his successor or successors in office, to be the true and lawful attorney or agent of such nonresident upon whom all lawful process may be served in any actions or proceedings accrued or accruing from such act or acts, or arising from or growing out of such contract or tort, or as an incident thereto, by any such nonresident or his, their, or its agent, servant or employee.
 
 
 21
 * * *
 
 
 22
 The doing of such business, or the engaging in any such work or service in this state, or the making of such contract, or the committing of such tort in this state, shall be deemed to be a signification of such nonresident's agreement that any process against it or its representative which is so served upon the secretary of state shall be of the same legal force and effect as if served on the nonresident at its principal place of business in the state or country where it is incorporated and according to the law of that state or country.
 
 
 23
 Miss.Code Ann. Sec. 13-3-57 (Supp.1989) (emphasis added).
 
 
 24
 At the outset we reject the claim of Cycles and the Yeagers that the Mississippi Supreme Court in Shewbrooks v. A.C. & S., Inc., 529 So.2d 557 (Miss.1988), expanded to the limits of federal due process the relatively restrictive scope of section 13-3-57. In Shewbrooks, the Mississippi court found that the defendant nonresident was doing business within Mississippi and thus was subject to process under section 13-3-57. The court also discussed the construction and validity of state-created statutes of limitation. After stating that the federal Constitution does not bar state legislatures from enacting statutes of limitation, the court said:
 
 
 25
 The only restriction placed on states in hearing out-of-state claims [i.e., claims against nonresident defendants] is the Constitutional limit placed on our long-arm statute. So long as an out-of-state litigant has enough minimum contacts in Mississippi so that the maintenance of a suit "does not offend the traditional notions of fair play and substantial justice," our courts have the power to hear a suit.
 
 
 26
 Shewbrooks, 529 So.2d at 565 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). This comment, in dicta, was not a construction of the state's long-arm statute. Such an aside does not control the application of section 13-3-57.
 
 
 27
 The Supreme Court of Mississippi has construed section 13-3-57 as applicable to three types of nonresident defendants: (1) nonresidents who make a contract with a resident to be performed in whole or in part within the state; (2) nonresidents who commit a tort in whole or in part within the state against a resident or nonresident; (3) and nonresidents who are "doing business" within the state. See Thompson, 755 F.2d at 1167-68, 1168 n. 5 (citing Smith v. Temco, Inc., 252 So.2d 212, 214-16 (Miss.1971)). We will consider whether WJD and, if necessary, the other defendants fall within any of these categories.
 
 A. Contract
 1. Lease-purchase agreement
 
 28
 When Cycles and the defendants entered into their contracts, Cycles was a resident of Arkansas, not Mississippi. Under the contract arm of section 13-3-57 a nonresident defendant must "make a contract with a resident of [Mississippi]" to be amenable to process. Miss.Code Ann. Sec. 13-3-57 (Supp.1989) (emphasis added). The threshold decision in whether Cycles is a resident of Mississippi for the purposes of this action. We have held that for tort actions under section 13-3-57, "residency is determined by the residency of the parties when the suit is filed, not when the action accrues." Golden v. Cox Furniture Mfg. Co., 683 F.2d 115, 117 (5th Cir.1982). As we find no contrary Mississippi authority we shall apply this rule to the contract aspect of this action.
 
 
 29
 A thornier issue is whether the fact that Cycles' interests are represented by an Arkansas bankruptcy trustee defeats the assertion that Cycles was a Mississippi resident at the time suit was filed. The parties have not briefed the issue nor has our own research disclosed any direct authority. However, because Cycles was incorporated under the laws of Mississippi, we doubt that the Mississippi courts would deny it resident status. We assume that Cycles qualifies as a Mississippi resident under section 13-3-57.
 
 
 30
 We turn now to the question whether WJD and Cycles entered into a contract "to be performed in whole or in part by any party in this state." WJD's contemplated performance under the lease-purchase agreement consisted of making payments to Cycles or its lessors and lienors, to use best efforts to secure for Cycles a loan and to return equipment to Cycles in case it terminated the agreement. The contract was silent as to where payments were to be made or where equipment was to be returned.
 
 
 31
 Cycles argues that where a contract fails to specify place of performance, the obligor must render performance at the obligee's location. Thus it contends WJD was obligated to render performance, that is, return the equipment upon the contract's termination and make payments to Cycles, wherever Cycles happened to be located when performance was due. After Cycles "moved" to Mississippi, WJD's obligation moved there with it.
 
 
 32
 Colorado, whose law the parties have chosen to govern interpretation of the contracts, has no reported case on point. The general rule, however, is that where a bailment contract is silent and no fair inference can be made regarding the place to which the bailee is to return bailed property, the bailee has the implied duty to return the bailment to the bailor at the place the property was received. See, e.g., Winchester v. Sipp, 252 Iowa 156, 106 N.W.2d 55, 57 (1960). Only where the parties reside within a reasonable distance of each other should the bailee return the bailment to the bailor at its residence upon termination of the bailment. 8 Am.Jur.2d Bailments Sec. 87C (1988).
 
 
 33
 The only fair inference to be drawn from the equipment-lease portion of the lease-purchase contract is that the equipment was to be returned to the leased garage in West Memphis, Cycles' then-place of business. Even were we not to draw this inference, according to the general rule WJD was obligated to return the equipment to the West Memphis garage, the place it was "received." Either way, Mississippi was not the contemplated place of return.
 
 
 34
 Similarly, where a contract between residents of different states is silent regarding place of payment, the payor is generally obligated to render payment at the place the contract was made. T.C. Young Constr. Co. v. Hartford Accident and Indem. Co., 441 S.W.2d 781, 783 (Ky.1969); 60 Am.Jur.2d Payment Sec. 21 (1988) (authority collected therein); cf. Carbonit Houston, Inc., v. Exchange Bank, 628 S.W.2d 826, 831 (Tex.Ct.App.1982) (payor's domicile is place of payment where contract silent); but see Liberty Mutual Ins. Co. v. Vanderbush Sheet Metal, 512 F.Supp. 1159, 1169 (E.D.Mich.1981) (under Michigan law debtor must seek out creditor at creditor's residence). Cycles cites as opposing authority three Colorado cases. Each case determined which county's courts had venue of a contract lawsuit between residents of different Colorado counties. The courts held that the contract's place of performance controlled in this intrastate situation. They further held that where payment was the issue and the contract was silent as to place of performance, payment was due in the creditor's county of residence. See Walter Brewing Co. v. Hoder, 230 P.2d 170, 173 (Colo.1951); Progressive Mut. Ins. Co. v. Mihoover, 87 Colo. 64, 284 P. 1025, 1025-26 (1930); People v. District Court, 70 Colo. 540, 203 P. 268, 269 (1922). We do not read these cases as inconsistent with the general rule.
 
 
 35
 The lease-purchase contract provides that WJD should make periodic payments either to Cycles or Cycles' lessors and lienors. None of the latter are located in Mississippi. Regarding the place of any payment to Cycles, the only fair inference that may be drawn from the contract is, once again, that payment would be made in West Memphis, Arkansas. That was the location of the leased premises and equipment and was the residence of Cycles and the individual plaintiffs when the agreement was made. Payment was due in West Memphis, Arkansas.
 
 
 36
 In contrast to its silence regarding the place of WJD's performance, the lease-purchase agreement locates the place of Cycles' performance. Cycles was obligated to transfer its ICC authorities to WJD, to turn over its equipment and to lease to WJD its West Memphis headquarters, garage and office facility. The closings of both the lease and purchase aspects of the transactions were to occur in Denver, the physical transfers were to take place in West Memphis. Thus Cycles was not obligated to perform in whole or in part in Mississippi.
 
 2. The noncompetition agreement
 
 37
 The noncompetition agreement obligates each individual plaintiff to refrain from competing with WJD and to render various "consulting" services, such as soliciting hauling contracts, bookkeeping, "operations and service," and "administration." In exchange WJD was to make payments to the individual plaintiffs. The contract is silent as to where these services and payments were to be tendered.
 
 
 38
 As a preliminary matter, we note that Sheila Yeager Hendrix remains a resident of Arkansas. Thus, with respect to Hendrix, WJD did not make a contract with a resident of Mississippi under the long-arm statute. Since Cycles, not the individual plaintiffs, was the victim of the alleged tort of conversion, Hendrix in her individual capacity has no tort claim. Thus, the district court had no jurisdiction over Hendrix' claim.
 
 
 39
 Neither did the district court have jurisdiction over the other individual plaintiffs' contract claims. No part of the noncompetition contract was to be performed in Mississippi. As analyzed under the lease-purchase agreement, WJD's performance, payments of money, was due in Arkansas. The contract did not specify where the Yeagers' consulting services were to be performed. However, because the plaintiffs resided in Arkansas at the time of contracting and because the services were to be rendered directly to WJD, which had offices in Colorado and, by virtue of the transaction, in Arkansas, the services were to be rendered outside of Mississippi.
 
 
 40
 In sum, under the contract prong of the Mississippi long-arm analysis, WJD made no contract with a resident of Mississippi to be performed in whole or in part within the state.
 
 B. Tort
 
 41
 Cycles alleges that WJD and the individual defendants converted the trucking equipment by not returning it as required by the contract upon termination. Cycles reasons that because the contract was silent as to where WJD was to deliver equipment upon termination, WJD was obligated to return the equipment to wherever Cycles then maintained its place of business. Cycles claims this became Mississippi when it moved there. Therefore, it contends, when WJD failed to return the equipment, it injured Cycles in Mississippi. Mississippi holds that a tort is not complete until injury occurs; if injury occurs in Mississippi then the tort occurred, at least in part, in the state for purposes of section 13-3-57. Thus, according to Cycles, WJD committed a tort against Cycles in part in Mississippi.
 
 
 42
 Cycles correctly characterizes the Mississippi Supreme Court's view on the operation of the long-arm statute with respect to tortious injury:
 
 
 43
 A tort is not complete until the injury occurs, and if the injury occurs in this state, then, under the ... statute, the tort is committed, at least in part, in this State, and personal jurisdiction of the nonresident tortfeasor is conferred upon the Mississippi court.
 
 
 44
 Smith, 252 So.2d at 216. Cycles errs, however, in its interpretation of the substantive law of conversion. A conversion occurs when a person exercises an unauthorized act of dominion or ownership over the personal property of another. Glenn Arms Associates v. Century Mtge. and Inv. Corp., 680 P.2d 1315, 1317 (Colo.App.1984); Masonite Corp. v. Williamson, 404 So.2d 565, 567 (Miss.1981). The conversion occurs when the unlawful dominion occurs. See, e.g., Horne v. Francis I. duPont & Co., 428 F.Supp. 1271, 1275 (D.D.C.1977). "The conversion is complete when the defendant takes, detains, or disposes of the chattel." Prosser and Keeton on Torts 106 (5th ed. 1984) (emphasis added). None of Cycles' allegedly converted equipment was located in Mississippi at the time of the conversion. Thus, any tort occurred wholly outside of Mississippi.
 
 
 45
 That Cycles may have suffered the economic consequences of a conversion in Mississippi does not affect the conclusion that no tort took place in whole or in part in the state. We have held that with respect to Mississippi's long-arm statute a tort occurs where and when the actual injury takes place, not at the place of the economic consequences of the injury. Estate of Portnoy v. Cessna Aircraft Co., 730 F.2d 286, 290 (5th Cir.1984) (citing Prejean v. Sonatrach, Inc., 652 F.2d 1260, 1270 (5th Cir.1981)); cf. Rittenhouse v. Mabry, 832 F.2d 1380, 1384 (5th Cir.1987) (patient injured by medical malpractice in Tennessee and suffering consequential pain in Mississippi cannot assert Sec. 13-3-57 jurisdiction over Tennessee physician otherwise lacking contacts with state). Thus, Cycles was not injured in Mississippi within the meaning of section 13-3-57 even if we were to assume that Cycles existed and was capable of changing residences after selling all of its assets and operating authorities to WJD.
 
 
 46
 1776 Corporation is accused of converting Cycles' property by purchasing it at foreclosure sales outside of Mississippi. We hold that 1776 was not amenable to process under section 13-3-57's tort prong for the same reasons WJD was not. The Digbys and Snyder are similarly not amenable to process under section 13-3-57 because any participation by them in any conversion took place outside of the state.
 
 C. Doing Business
 
 47
 The "doing business" aspect of section 13-3-57 applies to nonresident defendants who conduct "any business or perform any character of work or service" in Mississippi. The Supreme Court of Mississippi holds that in order to assert jurisdiction under this aspect of the long-arm statute: (1) the nonresident defendant must purposefully do some act or consummate some transaction within the state; (2) the cause of action must arise from or be connected with such act or transaction; and (3) the assumption of jurisdiction by Mississippi must not offend traditional notions of fair play and substantial justice. Rittenhouse, 832 F.2d at 1384 (citing Mladinich v. Kohn, 250 Miss. 138, 164 So.2d 785, 789 (1964)); see also Smith v. Temco, 252 So.2d 212, 215-16 (Miss.1971).
 
 
 48
 In addition to the long-arm statute, section 79-1-27 of the Mississippi Corporations Code applies to nonresident corporate defendants such as WJD. Repealed in 1988, but applicable to this suit commenced in 1980, section 79-1-27 provided:
 
 
 49
 Any corporation claiming existence under the laws of any other state or of any other country foreign to the United States, found doing business in this state, shall be subject to suit here to the same extent that corporations of this state are, whether the cause of action accrued in this state or not.
 
 
 50
 Miss.Code Ann. Sec. 79-1-27 (1972) (emphasis added). The Mississippi Supreme Court has held that this section weakens the nexus requirement under section 13-3-57. Arrow Food Distributors, Inc. v. Love, 361 So.2d 324, 327 (Miss.1978), cert. denied, 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979).
 
 
 51
 In light of the Arrow Food decision, this court has distilled three prerequisites to the assertion of federal court jurisdiction in Mississippi over nonresident corporate defendants: (1) the defendant must conduct business in the state of a systematic and ongoing nature; (2) the cause of action need not be directly connected with the activity but must at least be "incident to" that business activity; and (3) the assertion of jurisdiction must not offend notions of fairness or substantial justice. Aycock v. Louisiana Aircraft, Inc., 617 F.2d 432, 435 (5th Cir.1980), cert. denied, 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 343 (1981). However, if a court finds under section 13-3-57 that the nonresident corporate defendant is not doing business within the state, there is no jurisdiction under section 79-1-27 irrespective of the degree of relatedness the cause of action bears to the defendants' in-state activity. Rittenhouse, 832 F.2d at 1387.
 
 
 52
 The record reveals only two purposeful acts of WJD in Mississippi. First, it acquired in 1964 from the Mississippi Public Service Commission a permit to carry property through Mississippi in interstate commerce only. There is no evidence that WJD ever applied for or received a permit to transport goods between points intrastate. The record contains no evidence of how many miles WJD trucks actually travelled in the state. Second, two of the ICC operating authorities that were the subject of the lease-purchase agreement between Cycles and WJD permitted Cycles to ship from points out of state into Mississippi.
 
 
 53
 The acts of WJD on which Cycles grounds its causes of action are WJD's failure to return the trucking equipment upon termination, a breach of the lease-purchase agreement, failure to pay the Yeagers for not competing, a breach of the noncompetition agreement, and conversion of the equipment. None of these acts relates to the Public Service Commission or ICC permits to travel Mississippi roads, nor are the acts remotely "incident to" permission to operate on Mississippi highways.
 
 
 54
 We also find that WJD's business activities within Mississippi were not systematic and ongoing. The record indicates that WJD was not qualified to do business in the state, held no assets there, had no offices nor did it station sales or other employees there. It did not have permission to operate intrastate in Mississippi. There is no proof, and no indication other than the Mississippi Public Commission permit to operate interstate, that WJD actually drove any miles in Mississippi.
 
 
 55
 Similar facts faced the court in Allen v. Jefferson Lines, Inc., 610 F.Supp. 236 (S.D.Miss.1985), where the plaintiff was injured outside of Mississippi while riding in one of the defendant bus line's vehicles. The defendant had no agents, representatives, telephone listings, bank accounts or property in Mississippi, nor had it entered into any contracts there. It also did not have a certificate to operate intrastate in Mississippi. However, the defendant's buses travelled nearly 32,000 miles on Mississippi roads over a two-year period. Notwithstanding the accumulated mileage, the court found that the defendant's business activities were not systematic and ongoing under sections 13-3-57 and 79-1-27 because its only activity in the state was incident to purely interstate transactions. Id. at 239 (relying on Walker v. Savell, 335 F.2d 536, 543 (5th Cir.1964)). WJD's contacts were not systematic and ongoing.
 
 
 56
 In sum, because WJD's activities in Mississippi were not systematic and ongoing and the plaintiffs' causes of action are not incident to WJD's activities in state, WJD was not doing business in Mississippi within the meaning of sections 13-3-57 and 79-1-27.
 
 
 57
 The record contains no evidence that 1776 Corporation has ever conducted any activity in Mississippi, and the plaintiffs do not claim that the individual defendants have done business in the state. The doing-business arm of the analysis does not apply to any defendant.
 
 IV
 
 58
 There being no basis for jurisdiction under Mississippi law as to any of the defendants in this case, we do not reach the question whether jurisdiction may be asserted consistent with the due process clause of the fourteenth amendment to the United States Constitution, nor do we reach the appellants' other contentions.
 
 
 59
 The judgments appealed from are vacated. The action is remanded to the district court with directions to dismiss the claims without prejudice against all defendants for lack of jurisdiction. The judgment and order of the district court are
 
 
 60
 VACATED and REMANDED WITH DIRECTIONS.