# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 25, 2009

Charles R. Fulbruge III
Clerk

No. 08-60333

BURNSED OIL COMPANY INC.

Plaintiff-Counter Defendant-Appellee

v.

CELESTE C. GRYNBERG

Defendant-Counter Claimant-Appellant

Appeal from the United States District Court
for the Southern District of Mississippi, Jackson
USDC No. 3:03-CV-358

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:[*]

In this diversity action over the calculation of oil royalties, appellant
Celeste Grynberg appeals from the district court's grant of summary judgment
in favor of appellee Burnsed Oil Company, Inc. We affirm in part and reverse
in part.

## I. Factual and Procedural Background

The United States Bureau of Land Management issued a federal mineral
lease (the "BLM lease") covering 149.95 acres of land in Franklin County,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

Mississippi, to Irving Deemar effective September 1, 1967. The lease includes land within the production units for three wells (USA 29-14 #1 and Ezell USA #1 and #1A) and provides the United States with a 12.5% royalty interest. On September 13, 1967, Deemar assigned a 50% interest in the BLM lease to Jack Grynberg, husband of defendant-counter claimant-appellant Celeste Grynberg ("Grynberg"). On September 25, 1967, Deemar and Jack Grynberg executed an "Assignment of Operating Rights and Designation of Operator" (the "AOR") assigning their interest and operating rights under the BLM lease to a group of assignees, including Hellenic Oil & Gas Co. ("Hellenic"), with Hellenic receiving a 75% interest and a designation as operator.

In the AOR, Deemar and Jack Grynberg reserved for themselves an overriding royalty interest ("ORRI") of 12.5% (6.25% each) of all oil and gas produced and saved. The AOR provides that this ORRI "will be subject to the provisions of Section 192.83, Title 43, Code of Federal Regulations." Section 192.83 provided in relevant part:

> An agreement creating overriding royalties or payments out of production of oil which, when added to overriding royalties or payments out of production of oil previously created and to the royalties payable to the United States, aggregate in excess of 17½ percent shall be deemed a violation of the terms of the lease unless such agreement expressly provides that the obligation to pay such excess overriding royalty or payments out of production of oil shall be suspended when the average production of oil per well per day averaged on the monthly basis is 15 barrels or less.

43 C.F.R. § 192.83 (1961).[1]  Jack Grynberg assigned his interest to Celeste Grynberg in October 1995.

By 1989, production from all three wells had fallen below fifteen barrels per day.  In October 1992, the United States' royalty on the wells was reduced to 9.3% as a result of the Bureau of Land Management's "stripper well royalty reductions."  43 C.F.R. § 3103.4-2.  A "stripper well" is one which produces 15 barrels per day or less. *Id*.  This program was discontinued as of February 1, 2006.  70 Fed. Reg. 42093 (July 21, 2005).

Plaintiff-counter defendant-appellee Burnsed Oil Company, Inc. ("Burnsed"), became the successor operator to Hellenic, acquiring its interest on December 1, 1999, and taking over operations January 1, 2000.  At the time, division orders signed by Grynberg and the then-purchaser of oil from the wells, Scurlock Permian Corp., in 1997 were in effect, reflecting Grynberg's 6.25% ORRI in the USA 19-14 well and 3.9906% ORRI (adjusted for her pro rata share in the unit) in the Ezell wells.  In July 2000, Burnsed wrote the current purchaser, Plains Marketing, L.P. ("Plains"), directing it to reduce Grynberg's ORRI to 2.5% and 1.59625% respectively (that is, by 60%), as it asserted it was entitled to do under the terms of 43 C.F.R. § 192.83 (1961) ("§ 192.83").  Plains thereafter sent Grynberg new division orders reflecting these figures; Grynberg refused to sign these orders.  Grynberg was paid at the reduced rate for August and September 2000, after which Plains suspended payment for lack of signed division orders.  Burnsed received 75% of Grynberg's reallocated interest, with the rest allocated to other owners.  In September 2002, Jack Grynberg

---

[1] Section 192.83 was renumbered as 43 C.F.R. § 3125.4 in 1964 and as 43 C.F.R. § 3103.3-6 in 1970.  The language remained the same.

threatened litigation against Burnsed if past, full rate royalties were not paid and regular payments resumed. On October 15, 2002, Grynberg received a check from Plains for $9,826.79, the total of Grynberg's suspended payments at the reduced rate, without interest. On December 3, 2002, Grynberg filed suit against Burnsed and Plains in the District Court of Araphoe County, Colorado. Burnsed was ultimately dismissed from that suit for lack of personal jurisdiction.

On January 23, 2003, Burnsed filed the present action in the Chancery Court of Franklin, County, Mississippi, seeking a declaratory judgment that it correctly reduced Grynberg's ORRI and recoupment of royalties paid at the higher rate. On March 5, 2003, Grynberg removed the case to federal court and subsequently filed a counterclaim asserting, as amended, breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. On October 29, 2003, Burnsed filed a motion for summary judgment on its claim for a declaration that it correctly reduced Grynberg's ORRI, and on September 4, 2004, the district court denied the motion in a one page order. In the same order, the court set the case for trial on May 9, 2005. On February 25, 2005, Grynberg filed a motion for summary judgment. On April 19, 2005, the court issued an order removing the case from the trial docket and ordering briefing on the application of § 192.83. On March 31, 2008, the district court issued a memorandum opinion and order denying Grynberg's motion and granting Burnsed's motion "seeking summary judgment that Burnsed Oil properly reduced overriding royalty payments under [§ 192.83] and is entitled to recoup overpayments of overriding royalties from December, 1999, to August of 2000." Grynberg timely appealed.

## II. Standard of Review and Applicable Law

This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. *Chichakli v. Szubin*, 546 F.3d 315, 316 (5th Cir. 2008). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-movant." *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005). We apply Mississippi law in this diversity action. *See Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999).

## III. Discussion

### A. The Effect of Section 192.83

The district court held that the § 192.83 provision in the AOR allowed Burnsed to reduce Grynberg's ORRI when production is below fifteen barrels per day. Grynberg first argues that this clause does not apply because § 192.83 was altered in 1983 to make the suspension of royalties in excess of 17.5% optional at the Government's discretion, 43 C.F.R. § 3103.3-3 (1983), and then abrogated completely in 1988, 53 Fed. Reg. 17340, 17344 (May 16, 1988). *See USPCI of Miss. v. State ex rel. McGowan*, 688 So. 2d 783, 787 (Miss. 1997) ("[T]he effect of a repealing statute is to abrogate the repealed statute as completely as if it had never been passed."). Therefore, Grynberg argues, only the AOR could give

Burnsed the right to reduce Grynberg's ORRI, and the AOR says only that Grynberg's ORRI "will be subject to the provisions of Section 192.83," which no longer exists.

We agree with Grynberg that, because the BLM lease specifically states that it is subject to "all reasonable regulations of the Secretary of the Interior now or *hereafter* in force" (emphasis added), the repeal of § 192.83 applies to that lease. *See Ariz. Silica Sand Co.*, 148 IBLA 236, 238 (1999) ("[The Department of the Interior] has long held that the intent of the language 'now or hereafter in force' is to incorporate future regulations into existing permit terms when they become effective, even though such future regulations may place additional obligations or burdens on a permittee."). However, the relationship between Grynberg and Burnsed is governed by the AOR, which, unlike the BLM lease, contains no clear indication that its terms were to vary with future changes to § 192.83—it says only that Grynberg's ORRI "will be subject to the provisions of Section 192.83." The general rule is that "changes in the law subsequent to the execution of a contract are not deemed to become part of agreement unless its language clearly indicates such to have been intention of parties." 11 Richard A. Lord, Williston on Contracts § 30:23 (4th ed. 2004); *see also Fla. E. Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1130 (7th Cir. 1994) ("Whereas the law in effect at the time of execution sheds light on the parties['] intent, subsequent changes in the law that are not anticipated in the contract generally have no bearing on the terms of their agreement."); *Carter v. Cox*, 44 Miss. 148, 156 (1870) ("One of the most familiar principles to the profession, and one that may be accepted as an axiom, is that contracts are made with reference to the law at the time of their execution."). We see no reason to depart from this rule here,

6

and Grynberg does not dispute that, by its plain terms, the AOR would authorize Burnsed to reduce the total royalty burden to 17.5% on wells producing fewer than 15 barrels of oil per day if § 192.83 were still effective.

## B. Course of Performance and Waiver

Grynberg next argues that even if the AOR would otherwise allow Burnsed to reduce her ORRI, because Hellenic, Burnsed's predecessor in interest, never reduced Grynberg's ORRI although production on the three wells fell below 15 barrels per day beginning in 1983, 1984, and 1989, respectively, this "course of dealing or performance" should establish the meaning or supplement the terms of the AOR. Similarly, Grynberg argues that Hellenic waived its right to enforce the § 192.83 provision of the AOR by failing to do so for years after the wells' production first dropped below 15 barrels per day, and that Burnsed is bound by this waiver. *See Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So. 2d 954, 964 (Miss. 1999) ("Waiver is voluntary surrender or relinquishment of some known right, benefit or advantage." (quotation omitted)). The district court rejected these arguments, holding that Hellenic's conduct was irrelevant to the contract between Burnsed and Grynberg.

Course of dealing involves parties' conduct *prior to* a transaction and is not relevant here. *See* Restatement (Second) of Contracts § 223 (1981).[2] Further,

---

[2] Although the parties repeatedly cite to the Mississippi UCC and UCC cases, the cited portions of the UCC apply to goods and not to real estate transactions. Miss. Code § 75-2-102 ("Unless the context otherwise requires, this chapter applies to transactions in goods."). An oil and gas lease or royalty is an interest in real estate until the minerals are actually produced. *Nygaard v. Getty Oil Co.*, 918 So. 2d 1237, 1240 (Miss. 2005) ("[I]t is well settled by the great weight of authority from other jurisdictions that until brought to the surface and reduced to possession, oil or gas constitute an interest in real estate and not personal property. . . . [However,] royalty proceeds, once paid, are personal property and no longer considered an interest in land." (quotations omitted)); *see also Fletcher v. Ricks Exploration*, 905 F.2d 890, 892 (5th Cir. 1990) (applying Texas law) ("The contract to which Fletcher wishes

even assuming, *arguendo*, that the AOR's § 192.83 provision could reasonably be interpreted to accord with the course of performance between the Grynbergs and Hellenic, under our understanding of Mississippi law, that course of performance is not relevant to a dispute with Burnsed. In *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So. 2d 746 (Miss. 1987), UHS-Qualicare bought out the interest of one of two owners of a hospital and succeeded to its predecessor's contractual position as manager of the hospital. Considering an appeal of a suit alleging breach of the managerial contract, the Mississippi Supreme Court noted that "the construction which the parties themselves have given to a contract in the course of their life together under it . . . is of little benefit here, for UHS-Qualicare did not become a successor party to the contract until April 29, 1983, less than two months prior to the date on which it is said to have breached the contract." *UHS-Qualicare, Inc.*, 525 So. 2d at 754. Thus, an assignor's course of performance does not appear to be relevant in a contract dispute with an assignee under Mississippi law.

Course of performance is not merely an aid in interpretation, though: it can also be evidence of waiver. *See* Restatement (Second) of Contracts § 150 cmt. e ("A waiver under this Section may be found in a course of performance. Where there are repeated occasions for performance by one party and the other has knowledge of the nature of the performance and opportunity to object, a course of performance accepted or not objected to may be relevant to show the meaning of the contract, or a modification of it, or a waiver."); *see also Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 40 F.3d 1474, 1492 (5th Cir. 1995) (applying

---

to make himself a party is not a sales contract, it is a 'drilling' contract. The district court did not err in failing to apply [the] U.C.C.").

Mississippi UCC) ("In sum, we conclude that even though the parties' attempted modification was ineffective as such, the oral agreement to modify, coupled with the course of performance, demonstrates that CMR waived enforcement of the floor provision."). Because *UHS-Qualicare* involved the construction of a contract rather than modification or waiver, it may not bar the use of course of performance with a predecessor in interest to establish waiver. It is not necessary to decide this question, however. Grynberg argues that there is a fact question as to whether Burnsed is bound by Hellenic's waiver (if any) because Burnsed has not shown that it was a bona fide purchaser not bound by such a waiver.[3] However, the only authority provided by Grynberg, both before the district court and on appeal, for the proposition that Burnsed should be bound by Hellenic's alleged waiver is *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983), in which the Virginia Supreme Court stated that "all successors in interest with knowledge of [a modification by conduct] may be bound thereby unless they agree otherwise." Assuming for the purposes of this appeal that *Stanley's Cafeteria* applies here, Grynberg has not presented evidence that Burnsed had knowledge of Hellenic's failure to exercise its rights under the § 192.83 provision of the AOR. While Grynberg asserts that Burnsed

---

[3] Grynberg has also failed to provide either this Court or the district court with any authority on the application of the bona fide purchaser doctrine in the oil and gas context. At least one Texas court has refused to grant equitable relief against a purchaser of an oil lease absent proof that the purchase was not bona fide, which Grynberg has not presented. *See Newport Oil Co. v. Lamb*, 352 S.W.2d 861 (Tex. Civ. App.—Eastland 1962, no writ) ("Respondent is not entitled to equitable relief against a bona fide purchaser, however, and he has the burden of showing that petitioner does not enjoy that status."); *see also Williamson v. Elf Aquitaine, Inc.*, 138 F.3d 546, 550 (5th Cir. 1998) (quoting *Phillips Petroleum Co. v. Millette*, 72 So. 2d 176, 182 (Miss. 1954)) ("[F]or oil and gas issues of first impression, the Mississippi Supreme Court has long held that it will typically follow decisions of the Texas courts, depending, of course, on 'the soundness of the reasoning by which they are supported.'").

was obligated to examine all conveyances in Hellenic's title and is charged with notice of all facts that would have been revealed by a careful investigation of the facts in those conveyances, Grynberg fails to explain how—or even directly assert that—such an investigation would have revealed the purported waiver. Under these circumstances, the district court did not err in granting summary judgment for Burnsed on the waiver issue.

## C. The Calculation of the ORRI Reduction under Section 192.83

Grynberg next argues that even if the § 192.83 clause in the AOR applies, Burnsed has reduced her ORRI by more than would be allowed by that provision.[4] We agree.

Section 192.83's limit on royalties is 17.5%, including "royalties payable to the United States." However, in applying this limit, Burnsed did not account for the fact that as a result of the Bureau of Land Management's "stripper well royalty reductions," the United States' royalty on the wells was reduced from 12.5% to 9.3% from October 1992 to February 1, 2006. 43 C.F.R. § 3103.4-2 (royalty reduction); 70 Fed. Reg. 42093 (July 21, 2005) (notice of cancellation of reduction program). Thus, Burnsed directed Plains to reduce the total royalty burden to 14.3% rather than 17.5%, depriving Grynberg of an additional 1.6% interest (her half-interest in the ORRI reserved in the AOR).

While Burnsed stresses that these reductions were temporary and did not affect the United States' right to receive its full royalty once the program ended, this argument is contrary to the plain language of the relevant regulations. Section 192.83 states that "overriding royalties or payments out of production of oil which, when added to overriding royalties or payments out of production

---

[4] The district court did not address this argument.

10

of oil previously created and to the *royalties payable* to the United States, aggregate in excess of 17½ percent shall be deemed a violation of the terms of the lease." (emphasis added). And under the terms of the stripper well royalty reduction program, the United States' "royalty rate" was reduced. *See* 43 C.F.R. § 3103.4-2(b)(3)(ii) ("The formula-calculated royalty rate shall apply to all oil production (except condensate) from the property for the first 12 months. . . . If the production rate is 15 barrels or greater, the royalty rate will be the rate in the lease terms."). The royalty rate calculated under the royalty reduction program was clearly the royalty "payable to the United States" and should have been used in adjusting Grynberg's royalty to fit the 17.5% cap.[5] As a matter of law, Grynberg is entitled to recover these improperly withheld royalties, and the district court therefore erred in granting summary judgment for Burnsed on Burnsed's declaratory judgment claim and Grynberg's breach of contract claim.

## D. Conversion and Breach of the Covenant of Good Faith and Fair Dealing

Grynberg next argues that the district court erred in granting summary judgment for Burnsed on her claims for conversion and breach of the covenant of good faith and fair dealing. She asserts[6] that Burnsed breached that covenant

---

[5] We are not dissuaded from this position by Burnsed's argument that it would be contrary to the public purpose behind the royalty reduction program, which was to encourage production on marginal wells. As discussed above, although the § 192.83 clause in the AOR remains applicable, section 192.83 itself, which had a purpose similar to that of the royalty reduction program, had been abrogated by the time that program was introduced. The fact that Burnsed would benefit even more if we were to disregard the plain terms of the § 192.83 provision and the royalty reduction program does not convince us to do so.

[6] Grynberg also argues that Burnsed's failure to continue paying her unreduced royalty was a breach of the covenant of good faith and fair dealing. Because we have already addressed this claim above, we do not do so again here.

by excessively reducing her ORRI and not paying even her undisputed royalty payments for a period of two years, and that Burnsed's two-year failure to pay was also a conversion.

We need not engage in a protracted discussion to affirm the district court's judgment on these claims. "All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992). The Mississippi Supreme Court has characterized bad faith as "conduct which violates standards of decency, fairness or reasonableness." *Id.* Bad faith is more than bad judgment or negligence: it is "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive" and "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Bailey v. Bailey*, 724 So. 2d 335, 338 (Miss. 1998) (emphasis omitted) (quoting Black's Law Dictionary 139 (6th ed. 1990)). A conversion, under Mississippi law, "occurs when a person exercises an unauthorized act of dominion or ownership over the personal property of another." *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 619 (5th Cir. 1989).

Although, as discussed above, Burnsed's reduction of Grynberg's ORRI was not wholly authorized by the AOR, its asserted justification is not so implausible as to give rise to a suggestion of conscious wrongdoing. The same may be said of the withholding of Grynberg's royalties, even if we assume that it was improper and that Burnsed was responsible.[7]

---

[7] In her briefing to this Court, Grynberg does not argue that the withholding of her ORRI payments was a breach of contract, and we express no opinion on the subject.

12

Nor was the withholding of Grynberg's royalties a conversion. Under the AOR, Burnsed had the right to take the oil, and, as we have previously held, the failure to pay royalties in this situation is not a conversion under Mississippi law. *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 242 (5th Cir. 1984) (applying Mississippi law) ("Shell neither intended to exercise nor exercised any control inconsistent with the lessors' rights. It had every right to take the gas; it simply failed to pay royalties according to the proper measure. This is breach of contract but it is not conversion.").

## E. Burnsed's Recoupment Claim

Finally, Grynberg challenges the district court's judgment that Burnsed is entitled to recoup the excess royalties it paid at the higher rate subsequent to succeeding Hellenic but before directing Plains to reduce Grynberg's ORRI. Grynberg argues that the district court did not "actually enter a legal judgment on Burnsed['s] monetary claim for recoupment" because the district court's memorandum opinion and order, which is incorporated in the judgment, states that "judgment should be entered in favor of [Burnsed on its] motion . . . seeking summary judgment declaring that Burnsed . . . is entitled to recoup overpayments of overriding royalties,"—whereas Burnsed sought monetary damages in its recoupment claim, not a declaration. Grynberg also argues that Burnsed did not put on any evidence of its claimed damages in the district court, and that recoupment is barred by the voluntary payment rule.

We need not address the deficiencies in the district court's judgment because we agree that the voluntary payment rule bars recovery. The Court recently summarized the Mississippi voluntary payment rule in *Chris Albritton Construction Co. v. Pitney Bowes Inc.*:

13

> A voluntary payment is "a payment made, without compulsion or fraud, and without any mistake of fact, of a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand, and when there has been no agreement between the parties at the time of payment, that any excess will be repaid." *McLean v. Love*, 172 Miss. 168, 157 So. 361, 362 (1934) (citation omitted). . . . If the Plaintiffs voluntarily paid for something they did not owe, the voluntary payments cannot be recovered. *Id.* "The general principle is that, where the party with full knowledge, actual or imputed, of the facts, there being no duress, fraud or extortion, voluntarily pays money on a demand, although not enforceable against him, he cannot recover it back." *Graham McNeil Co. v. Scarborough*, 135 Miss. 59, 99 So. 502, 503 (Miss. 1924).

304 F.3d 527, 531 (5th Cir. 2002). Further, "the voluntary payment doctrine precludes courts from extending relief to those who have neglected to take care of their interests and are 'in predicaments which ordinary care would have avoided.'" *Id.* at 532 (quoting *McLean*, 157 So. at 362). Here, Burnsed continued to paid Grynberg her full royalty for approximately six months after acquiring its interest. In *Pitney Bowes*, we upheld a summary judgment for the defendants in a breach of contract claim involving an alleged failure to request proof of the plaintiff's own insurance before charging the plaintiffs for insurance on certain leased equipment, stating:

> Plaintiffs are presumed to have known under the contract that they should not be charged for a risk management program without having been first asked to provide proof of insurance. . . . When, as here, the party paying "knows or ought to know the facts" and does not avail himself of the means which the law affords him to resist the demand, he has not taken due care.

*Id.* The same analysis applies here. The basis for reducing Grynberg's ORRI is in the AOR, and Burnsed is presumed to have known of it. Further, as the

operator, Burnsed knew or should have known that production on the wells was less than fifteen barrels per day. Based on the summary judgment evidence, the district court erred as a matter of law in not entering judgment for Grynberg on Burnsed's recoupment claim.[8]

## F. Prejudgment Interest

Grynberg requests 8% prejudgment interest on unpaid royalties from the date payment was due. "In diversity cases, issues of prejudgment interest are governed by state law." *Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.*, 177 F.3d 326, 339 (5th Cir. 1999). "An award of prejudgment interest rests in the discretion of the awarding judge. Under Mississippi law, prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made." *Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n*, 964 So. 2d 1100, 1117 (Miss. 2007) (quotation omitted); *see also Sentinel Indus. Contr. Corp.*, 743 So. 2d at 971 ("Mississippi has long held that the prevailing party in a breach of contract suit is entitled to have added legal interest on the sum recovered computed from the date of the breach of the contract to the date of the decree.") (quotation omitted)). "Generally, if prejudgment interest is to be awarded, it dates from the breach of contract." *Estate of Baxter v. Shaw Assocs., Inc.*, 797 So. 2d 396, 403 (Miss. Ct. App. 2001). As discussed below, because this case has been lingering for some time, the parties have agreed to submit a joint statement of damages in lieu of remand for calculation thereof. Therefore, although it is typically initially a matter for the district court, we will consider

---

[8] Burnsed argues that the Scurlock Permian division order signed by Grynberg contains a provision in which the payee "agrees to reimburse Payor any amount attributable to an interest in which the undersigned is not entitled." This provision is not applicable, however, because Scurlock Permian—and not Burnsed—is the payor in the division order.

the issue of prejudgment interest in the first instance. The contract damages here were liquidated, and we think 8% prejudgment interest compounded annually from the date of each underpayment[9] to the date of this opinion is appropriate. *See* Miss. Code § 75-17-7*; Upchurch Plumbing*, 964 So. 2d at 1119; *Estate of Baxter*, 797 So. 2d at 402–07 (discussing appropriate methods of calculating prejudgment interest).

## IV. Conclusion

For the reasons discussed above, we agree with the district court that the § 192.83 provision in the AOR entitles Burnsed to reduce Grynberg's ORRI when production is below fifteen barrels per day. Because Burnsed failed to account for reductions in the royalties payable to the United States under the stripper well royalty reduction program, however, the district court erred both in holding that Burnsed reduced Grynberg's ORRI by the proper amount and in failing to grant summary judgment for Grynberg on that portion of her breach of contract claim. And while summary judgment was properly granted for Burnsed on Grynberg's claims for conversion and breach of the covenant of good faith and fair dealing, it should have been granted for Grynberg on Burnsed's recoupment claim.

This case has been pending in federal court for more than six years, and we are hesitant to add to that total by remanding for the calculation of damages.

---

[9] Because, as discussed above, the withholding of Grynberg's ORRI payments between September 2000 and October 2002 was not a conversion or breach of the covenant of good faith and fair dealing (and Grynberg does not argue on appeal that it was a breach of contract), no interest is due on the undisputed arrearages paid on October 15, 2002. Interest on the underpayments resulting from Burnsed's failure to properly account for the stripper well royalty reductions during this period, however, should be calculated from the day the payments would have been made in the absence of a dispute.

Counsel for both parties collegially agreed at oral argument that they would be able to determine, on the basis of the record, the appropriate amount of damages once informed of our decision.[10] Both parties are therefore directed to file a joint statement as to the amount of damages within thirty days, after which this opinion will be amended to render judgment in that amount. *See C&B Sales & Serv. Inc. v. McDonald*, 177 F.3d 384, 389 (5th Cir. 1999) ("We render rather than remand for reasons of judicial economy and because undisputed data in the trial record indicate the appropriate damage award." (footnote omitted)). These damages should include 8% prejudgment interest from the date of each underpayment, compounded annually. Post-judgment interest at the federal rate will accrue from the date of this opinion. *See* 28 U.S.C. § 1961; *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.*, 288 F.3d 222, 233 (5th Cir. 2002) ("Under 28 U.S.C. § 1961(a), in diversity cases, post-judgment interest is calculated at the federal rate, while pre-judgment interest is calculated under state law.").

AFFIRMED IN PART, REVERSED IN PART.

---

[10] This agreement in no way prejudices their right to seek rehearing or other relief.